## Post *vs.* Pearsall.

The *public* have not the right, *against the will of the owner*, to use and oc-
cupy his soil adjoining navigable waters, as a *public landing* and place of
deposit of property in its transit to and from vessels navigating such wa-
ters, although such *user* has been continued upwards of *twenty years* with
the *knowledge* of the owner.*

ERROR from the supreme court.   This was an action of
trespass *quare clausum fregit,* brought by *Pearsall* against
*Post,* for entering upon the land of the plaintiff, prostrating
his fences and depositing a quantity of manure.   The
defendant pleaded *non cul.* and gave notice with his
plea that he would give in evidence in bar of a recov-
ery, that at the time when, &c. and long before there
was and had been, on the close of the plaintiff, *a common*

---

* The supreme court held, when this case was before them, that the
doctrine of *dedication* of highways, streets and other easements in nature of
public ways, did not extend to *public landings.*   The judgment of that
court was *affirmed* in the court for the correction of errors.   Opinions were
delivered by *five* of the members of the court: four for affirmance and
one for reversal of the judgment of the supreme court.   The CHANCELLOR
and *Senators* EDWARDS and LIVINGSTON held that the principle of *dedica-
tion* of highways and of streets and public squares in cities and villages did
not extend to *public landings,* and therefore they were in favor of affirming
the judgment below.   *Senator* VERPLANCK, although concurring in the
judgment of affirmance, held that the principle of *dedication* of highways
and streets applies to *every use or easement in land, which can be of any ser-
vice, convenience or pleasure to the community at large,* and that consequent-
ly *public landings* are the subjects of dedication.   He however further
held, that *user alone,* though admissible as evidence *in corroboration* of
other proof of *actual dedication* by the *declarations* or *acts* of the owner of
the soil, is not enough in itself to warrant the *presumption* of a dedication
of easements, other than of highways, streets, and places in nature of
public ways.   *Senator* FURMAN agrees with Senator Verplanck as to the
extention of the principle of dedication; but goes farther and holds, that
proof of a *continued user* by the public of the soil of another for the term
of *twenty years,* for any beneficial purpose, with the *knowledge* of the own-
er, is sufficient to warrant the *presumption* of a dedication, unless rebutted
by evidence on the part of the owner that the use was permitted by *mere
license* revocable of course at the will of the owner, or by other evidence
showing the absence of *intention* on his part to *dedicate* the land to public
use, so as to deprive himself of the power of revocation.

*public highway and landing* on the east side of Hempstead Harbor, *for all the citizens and inhabitants of the state of New York,* to go, return, pass and repass, on foot and on horseback, and with cattle and carts, &c. at their free will and pleasure, and to *deposite, load and unload manure and other materials* at their like free will and pleasure : wherefore he, the defendant, being *a citizen and inhabitant of the state of New York,* and having occasion to use the same *way* and *landing,* at the said time when, &c. entered with cattle, carts, &c. upon the said *highway* and *landing,* and deposited, loaded and unloaded thereon a *quantity of manure,* as he lawfully might ; and because fences had been wrongfully erected and were then standing upon and across the highway and landing so that he could not pass, &c. he removed the same, doing no unnecessary damage. Upon the issue thus joined the cause was tried in September, 1838. The defendant admitted that the plaintiff was the owner of a farm of which he had been seised and possessed for five years and upwards, previous to the trial, and that his ancestors had been seized and possessed of the same for upwards of one hundred years. A map of the farm was produced exhibiting the mansion house of the plaintiff and his ancestors, Hempstead Harbor, a portion of the grounds designated as the *landing* lying directly in front of the mansion house, from which it was separated by a garden fence, and a store, store-house and other buildings on a public highway near the landing. *Israel Pearsall,* an ancestor of the plaintiff, was in possossion of the farm as long since as forty-five years before the trial ; he planted a number of cherry trees on the landing, and enclosed them with a fence which stood for a few years until the trees grew out of the reach of cattle ; with the exception of this enclosure, the landing had always remained unenclosed until about forty days previous to the trespass, when the plaintiff enclosed it with a fence. After the landing was enclosed the defendant arrived with a *sloop load of manure,* took down a portion of the fence and desposited the manure on the landing, against the will of the plaintiff and after having been expressly forbidden. The landing, as it is called, is a rugged knoll, terminating in a

Post v. Pearsall.

quagmire, and is unfit to be used for agricultural purposes. The defendant offered to prove that the portion of the farm called the *landing* had been used for *forty years*, and still was used *by the citizens and inhabitants of this state*, as a *landing place* to *deposite, load, and unload manure* and other materials thereon; that the same had been so used under a *claim of right* and *adversely* to the rights of the owners of the feé of the land, who *knew* that the public were using the same for such landing and place of deposit, during the time aforesaid; that the same had been *by such use dedicated* to the public by the owners of the farm, as a *landing place* and *place of deposite* of all kinds of manure and other articles carried to and from market; and that he, the defendant, at the time when, &c. was *an inhabitant of the town of North Hempstead* (in which town the farm is situated) *and a citizen of this state.* This evidence was objected to by the plaintiff's counsel and rejected by the circuit judge, on the ground *that the public could not acquire any right by user to the landing in question*: to which decision the defendent's counsel excepted. The jury thereupon found a verdict for the plaintiff with six cents damages and six cents costs. This verdict was rendered upon a second trial; on the first trial a verdict was found for the defendant, which was set aside by the supreme court and a new trial granted. See the case as presented on the first trial, and the opinion delivered upon the granting of a new trial, 20 *Wendell,* 111, *et seq.* Judgment having been rendered for the plaintiff on the second verdict, the defendant sued out a writ of error. The case was argued in this court by

*S. A. Foot*, for the plaintiff in error.

*H. P. Edwards & G. Wood*, for the defendant in error.

*Points insisted on by the counsel for the plaintiff in error:*
I. The *use* by the citizens and inhabitants of this state of a piece of ground for public purposes for twenty years and upwards, is evidence of a *dedication* thereof by the owner to the

public for the purposes for which it is so used, and especially if such use is with the knowledge of the owner, or adversely to him, and under a claim of right. *Lade* v. *Shepherd*, 2 *Stra.* 1004. *Rex* v. *Llyod*, 1 *Camp.* 260. *Rugby Charity* v. *Merryweather*, 11 *East*, 375, n. *Rex* v. *Barr*, 4 *Camp.* 16. *Jarvis* v. *Dean*, 3 *Bing.* 447, and 13 *Com. Law R.* 45. *Woolrych on Ways*, 9, 10, 12, 13. *Ham. N. P.* 192 *to* 194. *Denning* v. *Roome*, 6 *Wendell*, 656. *Livingston* v. *The Mayor of New York*, 8 *id.* 105. *Wyman* v. *The Mayor of New York*, 11 *id.* 499 *to* 502. *Cleaveland* v. *Cleaveland*, 12 *id.* 172. *Trustees of Watertown* v. *Cowen*, 4 *Paige* 513, 514. 3 *Kent's Comm.* 451, 3d ed. *Commonwealth* v. *Mc-Donald*, 16 *Serg. & Rawle*, 390, 392, 396. *Pritchard* v. *Atkinson*, 4 *N. Hamp. R.* 11 *to* 15. *State* v. *Wilkinson*, 2 *Verm. R.* 480, 485 *to* 488. *Abbott* v. *Mills*, 3 *id.* 524 *to* 527. *State* v. *Catlin*, *id.* 530, 533, 534. *Coolidge* v. *Learned*, 8 *Pick.* 504, 506, *to* 512. *City of Cincinnati* v. *White's lessee*, 6 *Peters*, 431. 3 *Kent's Comm.* 451, 3d ed. n. b. *Id.* 412, n. b. *The Marquis of Stafford* v. *Coyney*, 7 *Barn. & Cres.* 257. 14 *Com. L. R.* 41. *Ballard* v. *Dyson*, 1 *T. R.* 279. *Hart* v. *Chalker*, 5 *Conn.* 311. *Woolrych*, 34, 35.

II. This principle is applicable to rural as well as urban property ; and to watering places, docks, landings, places of deposite, open squares, and land for religious and charitable purposes, as well as to streets and ways for passage. *Trustees of Watertown* v. *Cowen*, 4 *Paige*, 510. *Bolt* v. *Stennett*, 8 *T. R.* 608. *Bethune* v. *Turner*, 1 *Greenl.* 111. *State* v. *Wilkinson*, 2 *Verm. R.* 480. *Abbot* v. *Mills*, 3 *id.* 521, 525 *to* 527. *State* v. *Catlin*, *id.* 530, 533, 534. *State* v. *Trask*, 6 *id.* 355, 363 *to* 365. *Coolidge* v. *Learned*, 8 *Pick.* 504, 506 *to* 512. *McConnell* v. *The Town of Lexington*, 12 *Wheat.* 582. *City of Cincinnati* v. *White's lessee*, 6 *Peters*, 431. 5 *Conn. R.* 311. *Beatty* v. *Kurtz*, 2 *Peters*, 566. *Powlet* v. *Clark*, 9 *Cranch*, 292, 331. *Inglis* v. *The Sailors' Snug Harbor*, 3 *Peters*, 99. *Shopleigh* v. *Pilsbury*, 1 *Greenl.* 271, 280. *Rice* v. *Osgood*, 9 *Mass. R.* 38, 44. *Hartford Baptist Church* v. *Witherel*, 3 *Paige*, 296. *McGirr* v. *Aaron*, 1 *Penn. R. Penrose & Watts*, 591. *Whit-*

*man* v. *Lex*, 17 *Serg. & Rawle*, 88, 91. *Burns' ex'rs* v. *Smith*, 7 *Verm. R.* 241.

III. The right which the public acquires by dedication is not an interest or profit in the soil of the ground dedicated, but an easement or servitude, subject to which, the owner still holds the title and the interest not dedicated, and rests on different principles from an interest or profit in the land of another. *City of Cincinnati* v. *White's lessee*, 6 *Peters*, 431, 432, 435 to 439, 441. 1 *R. L.* of 1801, 595. 2 *id.* of 1813, 277. *Laws of* 1817, 32. 1 *R. S.* 521. *People* v. *Lawson*, 17 *Johns. R.* 277, 279. *Co. Litt.* 56, *a.* *Woolrych on Ways*, 14, 15, 51, 52. *Paine* v. *Patrick*, 3 *Mod.* 294. *Rex* v. *Lloyd*, 1 *Campb.* 260. *Rex* v. *Barr*, 4 *id.* 16. *Commonwealth* v. *McDonald*, 16 *Sergeant & Rawle*, 390. *Todd* v. *Roome*, 2 *Greenl.* 61. *Estes* v. *Troy*, 5 *id.* 368. *State* v. *Wilkinson*, 2 *Verm. R.* 480, 481. *State* v. *Catlin*, 3 *id.* 530, 534, 535. *State* v. *Trask*, 6 *id.* 355, 363. *Trustees of Watertown* v. *Cowen*, 4 *Paige*, 514. *McConnell* v. *The Town of Lexington*, 12 *Wheat.* 582. *Co. Litt.* 110, *b.* *Id.* 113, *b.* 3 *Cruise's Dig.* 525, 526, *tit.* 31, *Prescription, ch.* 1, § 7, 8, 9. *Id. p.* 531, § 22, 23, 25. *Perley* v. *Langley*, 7 *N. Hamp. R.* 233. *French's case*, 4 *Co. R.* 32. 1 *Saund.* 341, *n.* 3. 3 *Cruise's Dig.* 530. *tit.* 31, *Prescription, ch.* 1, § 10, 21. *Paine* v. *Patrick*, 3 *Mod.* 393, 394, *Ham. N. P.* 172, 178, 179. *Foxall* v. *Venables, Cro. Eliz.* 180. *King* v. *Joliffe*, 2 *Barn. & Cress.* 54. 3 *Kent's Comm.* 436, 442, 443, 3d ed. *Pritchard* v. *Atkinson*, 4 *N. Hamp. R.* 14. *Gateward's case*, 6 *Coke's R.* 60. *Sherborn* v. *Bostock, Fitz.* 51. *Fitch* v. *Rawlings*, 2 *H. Black*, 393. *Grimstead* v. *Marlowe*, 4 *T. R.* 717. *Blewett* v. *Tregonning*, 3 *Adol. & Ellis*, 554. 30 *Com. L. R.* 163. *Weekly* v. *Wildman*, 1 *Ld. Raym.* 405. *Selby* v. *Robinson*, 2 *T. R.* 754. 3 *Cruise's Dig.* 123, *tit.* 24, *Ways*, § 6. *Stone* v. *Wakeman, Noy's R.* 120. *Ham. N. P.* 192 to 198. *Abbott* v. *Weekly*, 1 *Lev.* 176, 177. *Fitch* v. *Rawlings*, 2 *H. Black*, 393. *Co. Litt.* 56, *a.* *Manning* v. *Wasdale*, 5 *Adol. & Ellis*, 758. 31 *Com. L. R.* 433. *Baker* v. *Brereman, Cro. Car.* 419. 7 *Vin. Abr.* 183, *Customs, F. pl.* 2. *Id.* 178, *C. pl.* 2.

*Foxall* v. *Venables, Cro. Eliz.* 180. *Cooper* v. *Smith,* 9 *Serg. & Rawle,* 32, 33.

*Points insisted on by the counsel for the defendant in error :*

I. The only right in the soil of an individual which the public can enjoy, either by dedication or otherwise, is the right to use a *highway.* The doctrine of dedication to the public has been confined to highways or streets, and public squares in cities or vilages, which are ways for passage and recreation.

II. The reason why the doctrine of dedication has been applied to highways only, and public squares, which are a species of highway, is that the public necessities require such rights, inasmuch as all persons are supposed to use, or to require the use of, public highways ; and, for the further reason, that they are capable of being used by all persons, which other incorporeal rights are not ; and, therefore, the doctrine extends to no others.

III. It is well settled in England, that there cannot be a *public* right to an *interest* or *profit* in land ; and the right set up by the plaintiff in error is a right to an *interest* or *profit* in land.

IV. If the right in question is an easement, and not a profit in the ground or soil, it is not, and cannot be, in law, a public right.

V. Rights of easement or servitude, at common law, are not the subject of dedication to the public at large, but of *grant only,* or of custom or prescription, which presuppose a grant.

VI. The only right in the public at large known to the common law, except that of a highway, is the public right in the sea and its arms, and franchises in ports, havens and wharves incident thereto.

VII. The only dedication known to courts of equity is a dedication to *charitable uses ;* and, in case of charitable uses the dedication of them is always confined to a class or classes of persons not extending to the public at large, and there is always a legal ownership in a trustee, created ex-

pressly in the grant, or impliedly, by converting the grantor or his heir at law into such a trustee.

VIII. The right claimed in this case is not an *easement* or an *incorporeal* right of any kind. It is *corporeal*, and can only be exercised by taking exclusive possession of the premises and occupying the same to the exclusion of the owner ; that is, by ousting him from the possession, and committing an act for which ejectment would lie.

After advisement, the following opinions were delivered :

By the CHANCELLOR. Nearly the whole law on the subject of customary rights, easements, and public highways, and places in the nature of highways or public walks for health or recreation, and also of dedications for charitable or pious purposes, and the various decisions on these subjects, both in this country and in England, are collected in the very learned and elaborate opinion of Mr. Justice Cowen, who gave the reasons for the decision of the supreme court in this case, and in the case of *Pearsall* v. *Hewlett*, which is also before us for decision at this time. Little, therefore, remains for me but to apply the legal principles thus collected, to the facts of the case under consideration.

The plaintiff in error claims a prescriptive right for *all* the inhabitants of the state, or the public at large, to enter the *locus in quo*, which is unquestionably the soil and freehold of Pearsall, and to use it as a landing place to deposit manure brought thither by water, and to load and unload manure and other materials thereon. If this was claimed as a *customary right* in behalf of the inhabitants of a *town, hamlet* or other *local district*, it might be necessary to decide whether a right to deposit manure and other materials upon the land of another, and let them remain there until the depositor could make sale thereof, or until it suited his convenience to remove them, was such an easement as could be prescribed for as a customary right, without reference to any dominant tenement ; or whether it was a profit *a prendre*, or such an interest in the soil and freehold of another as could only be prescribed for in *a que estate*. In the great contest between

the ball players and the rabbits, relative to the right of deposit and the privilege of scratching within the golfing links of St. Andrews, which case was twice before the House of Lords in England, the late Lord Chancellor Eldon, although he amused their lordships at the expense of the Scottish judges, the magistrates of St. Andrews, the officers and students of the college, and of the golfing society, and was a little smutty withal, had in that case a strong impression upon his mind that a customary servitude or easement could not be supported, which would deprive the owner of the servient tenement, of the whole beneficial use of his property. *See Dempster* v. *Cleghorn*, 2 *Dow's Parl. Rep.* 40. I presume that strong impression was founded upon the established principle of the common law, that a custom to be good, must be reasonable; and I doubt whether any member of this court would consider a custom reasonable which should allow the community at large to deposite manure, without restriction as to kind or quantity, upon his premises, within a few rods of his mansion; and to suffer it to remain there until it suited the convenience of the depositors to remove it; especially if it should be bone manure, a commodity with which it seems the farmers in the neighborhood of the *locus in quo* have recently found it profitable to enrich their farms. Indeed, in its legal effect upon the rights of the owner of the soil, it is very difficult to distinguish the occupancy claimed in this case from the temporary occupancy by fishing huts, which was claimed in *Cortelyou* v. *Van Brundt*, 2 *Johns. R.* 357. But as the law is well settled that a customary accommodation in the lands of another, to be good, must be confined to the inhabitants of a *local district*, and cannot extend to the whole community or people of the state, the right claimed by Post, the plaintiff in error, cannot be sustained as a customary right or easement consistently with the rules of law.

Nor can it be sustained as an ordinary easement, founded upon a *presumed grant* from the owner of the premises in which the right or easement is claimed. Such easements are either personal and confined to an individual for life merely, or are claimed in reference to an estate or interest

Post v. Pearsall.

of the claimant in other lands as the dominant tenant; for a profit *a prendre* in the land of another, when not granted in favor of some dominant tenement, cannot properly be said to be an easement, but an interest or estate in the land itself. The three personal servitudes of the Roman law, use, usufruct and habitation, and which are still retained in the laws of France and of Spain and of Holland were not, strictly speaking, servitudes, but limited estates in the land; and they are now separately provided for as such by the *Napoleon Code* : one article of which expressly declares that servitudes cannot be personal, and that they can only exist when imposed upon an estate and for the benefit of an estate. *Art. 686.*

Neither can the right claimed in this case be sustained upon the principles upon which the *dedication* of highways and streets for the passage of carriages and other conveyances, and of public squares in cities and villages as promenades for the health and exercise of the inhabitants, have been declared and adjudged to be public rights. Public places of this description, as well as public highways, were well known even in the days of *Justinian*, and were protected by the same pretorian interdict from all obstructions which could interfere with the free passage of the people, without the consent of the public authorities. *Poth. Pand. de Just. lib. 43, tit. 8, art.* 1. They were equally well known in the ancient law of France, and embraced the public squares or promenades, where the whole community had a right to go; and the places where the public fairs were held. 14 *Guizot's Repert. art. Public.* Although at the time of the publication of the laws of William the Conqueror there were but four great roads in England called the king's highways, yet no one can doubt that there were, even at that time, innumerable thoroughfares, and many squares and open spaces, which had been dedicated to the use of the people at large, for passages and promenades; and the number since that time has probably increased an hundred fold. The law of *dedication*, therefore, which was applicable to thoroughfares, was properly applicable to market places and promenades, although they were not highways in

the ordinary sense of the term.  But a *public place for
landing and depositing manure* must, from its very nature,
be confined to a very few individuals ; and would generally
be permitted as a mere neighborhood accommodation, while
the owner of the land on which it was deposited had no im-
mediate use of the premises himself.  The only right, there-
fore, which would be likely to be acquired by long user
would be a right of easement or accommodation in favor of
the owners of the farms, for the use of which the manure
had from time to time been brought; so as to authorize their
successors in such ownership to prescribe in a *que estate*,
I think, therefore, it would be most unreasonable to, apply
the principles of dedication to such a case.  A dedication
for pious or charitable purposes does not vest a legal
right but merely creates a pious or charitable trust, which
under our statute relative to religious corporations is turned
into a legal estate.  *Dutch Church in Garden street* v. *Mott*,
7 *Paige*, 77.  *Curd* v. *Wallace*, 7 *Dana*, 192.  Such a dedi-
cation, therefore, has no applicability to the case under consi-
deration.

 The rights to public *watering places* on Long Island
can be sustained either as customary rights  or as easements
appurtenant to the estates which have been supplied with
water therefrom, for a sufficient time to raise the legal pre-
sumption of a grant.  The right to take water from the
pond of another is a mere easement, and not a profit *a
prendre.*   *Manning* v. *Wasdale*, 2 *Harr. & Woll.* 431.

I think the judgment of the court below in this  case was
not erroneous, and that it ought to be affirmed.


By Senator EDWARDS.   The first question which seems
naturally to present itself for consideration in this case is,
whether the *locus in quo* was *dedicated* to  the  public use ?
How are lands dedicated for such purpose ? They are ded-
icated by the *acts of the owner* or by *user*.   When they are
dedicated by the acts of  the  owner, no  particular form or
ceremony is necessary.  They may be  dedicated  to an-
other, or to a body corporate for the use of the public, by
*deed*, and then there must be a *grantee* as in other cases of

Post v. Pearsall.

grant. When the *fee* does not pass, the dedication need not be by deed; it may be effected by some unequivocal act of the owner manifesting his intention to dedicate the land to public use, and thereby induce individuals to vest property, which would be materially affected were the property again to be resumed by the owner. Where the owner of land has laid out village lots intersected with roads and public squares, it has been repeatedly held and very justly, by various judicial tribunals, that such roads and public squares are dedicated to public use. *Woodyer* v. *Hadden*, 5 *Taunt.* 125. *The State* v. *Wilkinson*, 2 *Verm. R.* 80. *The City of Cincinnati* v. *White's lessees*, 6 *Peters' R.* 431. *Livingston* v. *The Mayor, &c. of New-York*, 8 *Wendell* 85. *Wyman* v. *The Mayor, &c. of New-York*, 11 *id.* 486. *The Trustees, &c. oj Watertown* v. *Cowen*, 4 *Paige*, 510. But it is not the *fee* of the land that passes in such cases; the public have only an *easement* in the land; the fee itself, for all other purposes, remains in the original owner. *Cortelyou* v. *Van Brundt*, 2 *Johns. R.* 357. 1 *Burr.* 143. 2 *Strange*, 1004 1 *Wils.* 107. 6 *East*, 154. *Jackson* v. *Hathaway*, 15 *Johns. R.* 447. Hence it is not necessary there should be a *grantee*, as in the case of actual grants, and as the court say in 6 *Peters*, 436, this forms an exception to the general rule from the necessity of the case. But the case under review does not appear to be one in which the land has been dedicated to the public use, either by a direct grant or by any unequivocal act of the owner of the fee, from which it can be inferred he intended to dedicate it to the public. Nor is it so insisted on the part of the defendant's counsel. It appears to be unnecessary, therefore, to examine more minutely that class of cases which have been cited by the counsel relative to such dedications; but it is insisted by him that there has been a public *user* for such a length of time as to presuppose a grant, and therefore a dedication of the *locus in quo*, and on this particular point the case appears to rest.

As to the length of time the public are suffered to use property in order to constitute a dedication, it has been variously held. When the dedication has been made by the act of the owner of the fee, no particular time is necessary.

It may be immediate, or as soon as some act is done on the part of the public or individuals claiming an interest in such dedication, denoting their intention of accepting it. *Wood-yer* v. *Hadden*, 5 *Taunt.* 125. *Livingston* v. *The Mayor of New-York*, 8 *Wendell*, 85. *Wyman* v. *The Mayor of New-York*, 17 *id.* 486. *Trustees of Watertown* v. *Cowen*, 4 *Paige*, 510. *City of Cincinnati* v. *White's lessees*, 6 *Peters*, 431. *Abbot* v. *Mills*, 3 *Verm. R.* 526, 530. But where the dedication is to be inferred from public user only, time is essential ; and although by different tribunals different times have been adjudged neccessary, in the case of roads and public squares and such subjects as the public have an easement in, yet now it appears to be pretty well settled that it must be a period of at least twenty years. Chancellor Kent says : " The true principle on the subject to be deduced from the authorities, I apprehend to be, that if there be no other evidence of a grant or dedication than the presumption arising from the fact of acquiescence on the part of the owner in the free use and enjoyment of the way as a public road, the period of twenty years applicable to incorporeal rights would be required, as being the usual and analogous period of limitation ; but if there be clear, unequivocal and decisive acts of the owner, amounting to an explicit manifestation of his will to make a permanent abandonment of the road, those acts would be sufficient to establish the dedication within any intermediate period." 3 *Kent's Comm.* 451. *Campbell* v. *Wilson*, 3 *East*, 294. *Hill* v. *Crosby*, 2 *Pick.* 466. *Gayety* v. *Bethune*, 14 *Mass. R.* 49. *Wood* v. *Veal*, 5 *Bos. & Pull.* 454. Our statute with respect to roads has settled it at twenty years. If the *locus in quo* then had been a road, or a public square which is controlled by the same principles, the length of time the public have been suffered to use it, is sufficient to have presumed a grant, and therefore a dedication to public use. But here, in my view, lies the whole difficulty on the part of the defendant. It is neither a road or public square, nor a dedication for charitable or religious purposes, nor is it analogous to either as to the principles of dedication by user. In case of a road or public square, the public having only

Post v. Pearsall.

an easement, the fee remains in the original owner for all purposes except those of travel and transit, and such purposes as are, incident thereto ; but the claim here set up is the right to deposite manure upon the plaintiff's land by user ; it is a claim which, if allowed to prevail, each individual could not enjoy, for the deposite and possession of a few individuals might exclude the many. But will it be said that the use must be consistent with the rights of each ? What are those rights ? to what extent and how long are they to be enjoyed by each ? What power or tribunal could define them ? Who shall say that these rights, if allowed to exist, shall fall short of a *continued use,* and therefore be an appropriation of the soil itself, and instead of constituting an easement be equal to an absolute fee ? What value in the fee would remain after the right of continued deposite is once conceded ? In the case of *Cortelyou* v. *Van Brundt,* Mr. Justice THOMPSON, who delivered the opinion of the court, says, nor will prescription in any case give a right to erect a building on another's land. This is a mark of title and of exclusive enjoyment, and it cannot be acquired by prescription. Prescription applies only to incorporeal hereditaments, and whether the right claimed be considered strictly a custom or prescription, the principle is the same. Now can that which appropriates the whole use of the soil for an unlimited time be considered an incorporeal hereditament ? Is it not as much a mark of title and *exclusive enjoyment* as the erection of a house ? In the case of *Coolidge* v. *Learned,* 8 *Pick.* 504, which is the case most in point for the defendant, the defendant justified by a plea setting forth that the *locus in quo* was a common public landing place adjoining Charles river, and that the citizens of the commonwealth had a right to use it from time immemorial ; and the court held the right as a public prescriptive right well pleaded. This case however, I apprehend, does not intend to establish the principle that the right to deposite goods upon the land of another is a prescriptive right. The prescriptive right alluded to by the court is most probably the right of landing and loading and unloading for the purposes of transit by means of a road communicating with the river ;

but if it is intended to go farther, I cannot concede it to be law.

In the case of *Paine* v. *Patrick*, 3 *Mod.* 294, it was held that a custom alleged for all the occupiers of a close in such a parish to have a footway is not good, because the plaintiff ought to prescribe in him who has the inheritance. Apply this rule to the present case. How could the defendant here prescribe in him who has the inheritance? Have all the citizens of the state the inheritance? This will not be pretended. Has the defendant such right? He cannot have it; he claims only the same right as all other citizens of the state. Could the plaintiff have such right? If the doctrine the defendant sets up be correct, certainly not, for the right of deposite, it is contended, is in the people at large. If the doctrine here contended for be allowed to prevail, it would take from the owner every thing valuable in the soil; it would take the substance and leave to him the shadow; and thus a mere prescriptive right which is claimed to confer only an easement in the public, would be permitted to have such an effect as substantially to deprive the owner of the fee, of the land. An *easement* is defined to be a service or convenience which one neighbor has of another by charter or prescription, *without profit*, as a way through his land. 2 *Jac. Law Dic.* 332. But can it be said that the right to deposite upon another's soil until the depositor can make sale of the article, or for an unlimited time, is without profit?

There is a manifest difference between an *easement* claimed as a matter of right by dedication, and a *license*. Chancellor Kent says a claim for an easement must be founded upon a grant by deed or writing, or upon a prescription which presupposes one, for it is a permanent interest in one's land, with a right at all times to enter and enjoy it. But a license is to do a particular act or acts upon another's land without possessing any estate therein. 3 *Kent's Comm.* 452. In case of an *easement* the public acquire a right which cannot be resumed without their consent. 3 *Verm. R.* 530. 2 *Peters*, 566. 8 *Wendell*, 85. 11 *id.* 486. In case of a *license* a privilege only is granted or has grown up from user by sufferance, which secures no right and may be

Post v. Pearsall.

revoked at pleasure. In the case of an *easement* the law presumes the grant and consequently presumes the owner intended to dedicate the right, and therefore will not suffer it to be revoked. In the case of a license it presumes no grant, claims no right, and suffers it to be revoked at pleasure. It appears, therefore, it is most congenial with the sound principles of law, and most consistent with right and justice, to consider the practice of depositing manure upon the *locus in quo* as having been continued, for a great length of time, by the sufferance of the owners of the soil, arising from a feeling of generosity towards their neighbors, than an intention on their part to dedicate to the public an absolute right of deposite; and that it would be unreasonable and unjust for the law to draw any other inference from the practice which has prevailed in making the *locus in quo* a place of deposite, and that therefore the owners of the soil had a right to suspend this practice at their pleasure. If such license to use another's soil, either by actual permission or sufferance, for special purposes, were to be held a dedication to publc use, the law would do great violence to the rights of the owner of the fee, and would prevent in a variety of cases those acts of generosity and liberality which the owners of the fee so frequently confer upon their neighbors and the public, in the free use of their soil as places of deposite. Should the doctrine here contended for by the defendant be suffered to prevail, I see no reason why the public could not claim by dedication, as a matter of right, the numerous places upon our canals, lakes and rivers, where the owners of the fee have suffered wood, lumber, gypsum and other articles of traffic to be deposited from time to time for twenty years. It appears to me the principle which would sanction the right in the one cese, would in the other; and if it were permitted to prevail, would do great injustice to the owner of the fee, whose acts of liberality the law should thus pervert. I am therefore for affirming the judgment of the supreme court in this case.

By Senator Furman. This case presents for consideration two propositions: First. Can there be a *dedication* to

the use of the public of an easement, such as that here claimed ? and if there can, secondly, does the evidence adduced and offered upon the trial at the circuit establish such dedication ?

In order to a proper understanding of the law as applicable to a case like the present, and consequently to a correct decision of this matter, it will be necessary to examine, in a brief manner, the progress of the law both in England and in this country ; and to disencumber the subject under advisement from a mass of legal principles and decisions which have no proper application to it, and which unless fully understood and properly discriminated, serve no purpose but to confuse and mislead the mind, and to involve the imagination in a labyrinth of technicalities, which have no real existence in their application to it.

The law of England, according to Lord Coke, forms a triangle : one side of which is the *common law*, extending to and over the whole kingdom ; another side is the *statute law*, enacted by parliament for the government either of the whole community, or of such parts and portions of it as in their wisdom the exigencies of the nation require ; and the third side is formed of the *customs*, repugnant to the common law and beyond it, and which are applicable to particular communities of individuals. The common law and the statute law of England are well known, and it is therefore unnecessary to waste time in their further description. As to *customs* and *prescription*, however, so much has been said on this argument that I deem it proper to spend a short time upon their consideration.

A *custom* can only exist in favor of the community of a town village or hamlet, &c. and must be pleaded ; and because the claimants have been in the immemorial use of the right claimed, the legal presumption in England is, that those customs were originally based upon and created by act of parliament ; although not by that body as it is now constituted. But the inhabitants or tenants within any such vill or place cannot allege or plead a custom to have an interest or *profit a pendre* out of another's soil—that must be alleged by way of prescription, and not by custom ; unless in the case

of a copyhold tenant against his lord; or where the party pleading is a stranger to the title. *Salk.* 335. 4 *T. R.* 718. Custom cannot be pleaded in favor of the whole nation, for then it becomes the common law. *Prescription* is set up in favor of individuals who, because they have been in the enjoyment of the right or interest claimed, during the period of legal memory, which is in England fixed at the reign of Richard I., the law presumes that the party claiming, had originally a grant or conveyance for the right claimed. A profit or interest in the soil of another, or as it is termed in the Norman French, a right of *profit a prendre in alieno solo,* cannot be claimed by the residents or inhabitants of a town or village, but must be prescribed for in a *que estate* by some person or persons capable of taking a grant; and it forms part of their inheritance as an estate in the freehold, and it goes to a man and his heirs. Prescription could never be set up in favor of the whole nation, and in this country it cannot properly exist at all.

This particular branch or side of the English law arose in feudal times, when the superior lords were actually the owners of the soil of the whole kingdom, excepting the royal demesne and the patrimony of the church, and apportioned the same out to their knights, retainers and copy holders, on the condition of certain services; and attached to those estates the right to take common of pasturage, of wood, of water, &c. as they deemed the same neccessary, both for their own interests and to enable their retainers to cultivate and improve their lands to the best advantage. It was, however, soon discovered that various individuals, residents and owners of estates in towns, and corporations, (which then began to have an existence,) required for their convenience in trade and travel, the right to pass over some of these lands; and from that grew up the *easement by prescription;* which is not an interest or *profit a pendre,* but only a servitude, or right to pass over or use the surface of the soil; and this distinction is fully recognized by *Gateward's case,* 6 *Coke's R.* 60. This easement by prescription, is always to individual persons, or to

a corporation, and to those who are not incompetent to receive a grant.

But none of these customs, prescriptions, or easements by prescription, applied to the public; they could acquire no right under them. But it has long been held one of the greatest advantages of the English law, that it has always accommodated itself to the increasing wants of a thriving commercial people; and, therefore it is, we find the interest of the public was not long lost sight of, by the English courts, even at a very early period. Although the public could not prescribe for a custom for a profit or interest in the soil of another, and neither could they prescribe for an easement, yet we find it laid down as law, that there may be a *custom for an easement*, as a right of way on another's soil, 1 *Saund.* 341, *n.* 3; and that a multitude of persons may not prescribe for an easement, although they may claim a custom for an easement. 3 *Cruise's Dig. tit.* 31, *Prescription, ch.* 1, *sec.* 21. This was an approach toward the modern doctrine, but still there was some of the old leaven adhering to it. This custom to give the public the right, must be for the time of legal memory; and this doctrine if continued to be adhered to by the courts in England, would limit the acquisition of those rights on the part of the public, and might be the means of retarding the onward progress of the nation. In order to obviate this difficulty, the *easement by dedication* to the use of the public, obtained its existence. This principle arose from the exigencies of the community; and the courts in that country seem to have regarded those exigencies as calling upon them liberally to apply it, and not to throw the community back upon those antiquated rules which, though very well adapted to their situation and circumstances at the period when they were applied, would now, in the advanced state of society, be entirely inapplicable, and if resuscitated, would be the fruitful source of almost interminable disputes and legal controversies. The first reported case in England, in which this principle of *dedication* was adopted, is that of *Lade* v. *Shepherd*, 2 *Strange*, 1004, which was decided at Hilary term, eighth year of the reign

Post v. Pearsall.

of George II., in the year 1735, now more than a hundred years ago.   In that case, a dedication to the public of a road or highway was sustained upon mere user ; and that was done at the first promulgation of the doctrine.   Having thus deduced the progress of the English law to the adoption of the principle of *dedication,* and that too at a period which makes it obligatory upon our courts, and which also constitutes it a part of the common law of our state, it is necessary to advert for a moment to the situation of the law as peculiarly applicable to our own country.

When our forefathers settled this land, they brought with them the common law as it existed in England, and such parts of the statute law of that nation as were applicable to the situation and circumstances of the colonists ; which common law, together with the decisions of the English common law courts, including among them that referred to in 2 *Str.* 1004, at the adoption of our constitution in 1776, became the common law of our government and direction, except so far as the same was inconsistent with that instrument, or was abrogated by statute ; and it is not pretended that the principle of dedication as laid down by that decision comes within that exception.   I shall, therefore, assume that the principle in question formed a part of our common law at the very earliest period of our national existence, now more than sixty years past ; and that the subsequent decisions of our courts were merely in affirmance and in extension of that principle, and did not give it its vitality or existence.   It was admitted, however, on the argument, that the third side of the triangle of the English law, the *Law of Customs,* was never brought to this country ; and that there is no such thing in this state as a custom by prescription, for an interest or profit in the soil of another ; which, indeed, is the legal proposition decided by the supreme court in the case of *Cortelyou* v. *Van Brundt. 2 Johns. R.* 357, and is the extent of the law as decided by that case.   This being the fact, and the progress of the English law being had in consideration, together with the peculiar principles which apply to those customs by prescription, and the fact that they never were extended to the

public, it is very difficult for me to see or realize in any manner the force or analogy of those principles to the subject now under consideration.

As the law now exists in this state, and as it has in substance existed ever since the formation of our constitution, the only way that an *individual* can acquire a right in real estate is, by grant, or by an adverse possession of twenty years under a claim of title, in which case the law presumes a grant; and as to the *public,* the only way in which they can at the common law acquire an easement in the lands of another is, by *dedication.* It is true the owner of land, having an undoubted right to give the public an easement in it, may do so, if he chooses, by *deed;* and there being no grantee to take by indenture, it may be by *deed poll;* but that is not the usual way of proceeding. The acts constituting the dedication are almost universally, if not entirely, *in pais.*

It then becomes requisite to ascertain what is a *dedication,* and what the evidence of it; and then to what subjects has this doctrine been applied, in order to see if the matter in question is the subject of dedication, and whether the proof given and offered is that usually adduced to sustain such an act in favor of the public. What is a dedication? It is an act by which the owner of the fee gives to the public an easement in his land; and a *parol* dedication is good, and is generally the only one made; and although there is no grantee to take, it vests in the public, and is different from ordinary grants, and is to be construed upon principles to meet the nature of the case. 6 *Wendell,* 656. 3 *Verm. R.* 526. 17 *Serg. & Rawle,* 93. 3 *Verm. R.* 533. 6 *id.* 364. 6 *Peters,* 435. There is no particular form or ceremony necessary in such dedication of the use to the public. 6 *Peters,* 435. " The simple act of throwing open the property to the public use, without more, is sufficient to create this right, and no other formalities are essential ; the case is therefore anomalous, and general utility is the principle which sanctions this mode of conveyance ; and whatever may be the owner's real intention, if his conduct is at variance with his purpose, he cannot afterwards contest the

Post v. Pearsall.

right of the public, who perhaps have embarked in projects and formed expectations, upon the strength of the appearances he held out to them, which it would be ruinous to disappoint." *Hamm. N. P.* 193, 4, *Am. ed. of* 1823. To apply the principle thus laid down to the present case, is a matter of no difficulty. The ancestor of the defendant in error throws open this landing to the public more than twenty years ago, and his descendant suffers it to remain open ; and not only so, but as if to put the matter beyond a doubt that he intended it to be a dedication to the public use, puts up a fence between the land he immediately occupies and this landing, thus marking out its extent ; and he not only does that, but having planted some trees upon it which afforded shade to those who resorted there, in order to protect those trees from injury, he puts a fence immediately around them, thereby showing that he intended that the other part forming nine-tenths of the landing was still to remain open, and to be used by the community at large, with their horses and teams, and that to such an extent, that those trees would be destroyed unless specially protected: and to show that was his view, he kept that fence around them only until they had grown beyond the reach of the cattle ; and having held out these appearances to the public, they having bought and sold their farms with a reference to the convenience thus afforded for bringing that necessary article, manure, from a distance, by water, to within a short ride of their land, and thus enabling them at a reasonable expense to cultivate the same, and the public having for forty years unloaded their manure at this landing from sloops, under the eye of this owner, he living within a few yards of this landing, and that without any intimation on his part that they were using it under a license from him. Whatever therefore may have been his real intention, or that of his ancestor, they having kept it to themselves, and their conduct having been at variance with what is now claimed was their purpose, he cannot now contest the right of the public. For this reason, the circuit judge was in error when he told the jury, on the

first trial of the issue, that they should be satisfied that the owner knew of such claim on the part of the public. Under a state of facts as exists here, it is an inference of law that the owner did know of such claim ; and he can only rebut it, by showing affirmatively that he had done some act to inform the public that they enjoyed such right only by his *license,* or that they had but a partial dedication of the landing ; and this is clearly shown to be the rule by the English cases cited on the part of the defendant in error in 1 *Campb.* 263, *note,* and 7 *Barn. & Cress.* 243. The rule laid-down by the circuit judge only applies to cases where the owner of the fee is not in the vicinity of the easement thus claimed and used, and for that cause cannot be personally cognizant of the manner of the user on the part of the public, as appears from the case of 8 *Pick.* 504 ; and there is good sound reason for this distinction apparent to the mind of every man. But in the case of a personal cognizance of this continued user on the part of the public for the long period of time for which this has existed, if the owner claims in opposition to the legal principle deducible from it, he should be held to show what he had done to limit and abridge the right of the public; and it is much easier for him, an individual, to show how the fact is than for the public to do so—in the preservation of whose rights, no single person feels any particular interest.

In this class of cases, there may be instances, contrary to the general rule, where the fee may remain in abeyance until there is a grantee capable of taking, as where the object and purpose of the appropriation look to a future grantee in whom the fee is to vest. But the validity of the dedication does not depend upon this ; it will preclude the party making the appropriation from reasserting any right over the land, at all events, so long as it remains in public use, although there may never arise any grantee capable of taking the fee. 6 *Peters,* 435. 2 *id.* 566. 9. *Cranch,* 292.

The right of the public in such cases does not depend upon a twenty years' possession ; the question is, whether the subject of the dedication has been used by the public as such, with the assent of the owner of the soil, and not

whether such use has been for a length of time, which would give the right by force of possession ; nor whether a grant might be presumed. It is implied that the fee remains in the owner of the soil, but that it became dedicated to the public use by his permission to have it so used ; and such use should be for such a length of time, that the public accommodation and private rights might be materially affected by an interruption of the enjoyment, 3 *Bing.* 447 ; 6 *Peters,* 435 ; and it may, if the act of dedication be unequivocal, take place immediately. 5 *Taunton,* 126.

All dedications to the public are for such use as the public have occasion for ; and they must be considered with reference to the use for which they are made. Streets in a town or city may require a more enlarged right over the use of the land, in order to carry into effect the purposes intended, than may be necessary in an appropriation for a highway in the country. But the principle, so far as it respects the right of the original owner to disturb the use, must rest on the same ground in both cases, and is applied equally to the dedication of the common in Cincinnati as to streets. 2 *Strange,* 1004. 6 *Peters,* 435. After such dedication to the use of the public, and the subject is enjoyed as such, and private individuals have acquired rights with reference to it, the law considers it in the nature of an estoppel *in pais,* which precludes the original owner from revoking such dedication. Such revocation would be a violation of good faith to the public, and to those who have acquired private property with a view to the enjoyment of the use thus publicly given. 6 *Peters,* 435. And to establish a different doctrine would not only be prejudical to the public, but produce disappointment and ruin to individuals. 2 *Verm. R.* 480. And in concluding this description of a dedication, I would observe that the supreme court of the United States, in 9 *Cranch,* 292, declare that this doctrine of dedication is not a novel doctrine in the common law, and well they might do so, if the sanction of more than a century is sufficient to remove the stain of novelty from a legal proposition ; but the near approach and tendency of the

English courts to this just and equitable principle may be traced to even a much earlier period; and, in my judgment, may be found in the reasonings and principles of those tribunals, when they laid down the law to be, that although the public could not prescribe for a custom, nor prescribe for an easement, yet they might claim *a custom for an easement*—that is, they might show, that from time out of mind the public had enjoyed the use of the right or easement, the subject of controversy, and they would protect them in its enjoyment, although they could not show an actual grant.

There is no principle in the *civil law* strictly analogous to that of dedication at the common law. The servitudes of the civil law are rights which one person has in the land or building of another, by which the owner is limited in the use of his property, and obliged either to suffer, or not to do something in his own land or building, for the benefit of another person who has a claim upon it. This doctrine of servitudes does not apply to the public, the reason for which will be seen in other principles of the civil law. In that law the soil belongs to the public or nation ; but nevertheless every one is master of his own property, and may enjoy his right of occupation and use in it, which led to a distinction between what is called the *dominium eminens*, and the *dominium vulgare*. By the latter was meant the right which individuals enjoyed by the permission of the state, in property, and by the *dominium eminens*, that right and interest therein which the public still reserved to itself, and by virtue of which the state could moderate, restrain, set bounds to, or direct individuals in the enjoyment of their property in such manner as should best suit with the public interest. The property thus belonging to the state by this *dominium*, could be resumed if the public good required it; and that, not only when the safety of the state was concerned, but even its convenience ; the owner being allowed the fair value of the land so taken, as otherwise he would be required to contribute more than his equal proportion to the public burthens.

A similar principle, that all the lands belonged to the crown, once obtained in England ; but there it has long

since ceased to be any thing but a legal fiction; and the law proceeds both there and in this country upon the basis of the individual disposing of his property to the public, and not their taking it from him; but it is a living and active principle in the civil law, and shews the reason why the doctrine of dedication is not to be sought for in any country governed by that law in its full vigor; and also shows the inapplicability of the principles which might be cited from the civil code for the purpose of elucidating the subject now under inquiry. I do not wish to be understood, however, as advancing the principle that a man might not under the civil law give his property to the public, for he might do so; and in *Cooper's Justinian, p.* 60, it is laid down, that " any man may, at his will, render his own place religious by making it the depository of a dead body;" and that if a dead body be laid in a place by the consent of the owner, the place becomes religious, though he afterwards dissents. In that case the owner parts with all the interest he has in the land, and cannot resume it. But what I mean is, there are no easements at the civil law in the public, because the necessity for them does not exist by reason of the law itself. Thus disposing of the first branch of the enquiry, " What is a dedication? " I now come to examine the second division of the question, What is the evidence of such dedication?

In the case of *Denning* v. *Roome*, 6 *Wendell,* 656, the supreme court of this state intimate that there has been a great diversity of opinion among the English judges on the subject of dedication, and that what facts shall amount to a dedication is still a matter of dispute among them, and then proceed to state that *Chambre*, Justice, in 5 *Taunt.* 137, thought *time* was not necessary to make a dedication; and Lord *Kenyon* held that a period short of 20 years, *eight* or even *six* years of general use would be evidence of a dedication; and they conclude by remarking that other judges have regarded a much longer use essential to make out the right in the public. · I think, however, that when we come to examine critically the decisions as to what shall be evidence of a dedication to the public use, both in England and

in this country, we shall find an extraordinary unanimity among the judges of all those courts upon that point; and that *user* alone has been held the evidence of such a dedication to the public.    And in truth what other possible evidence could be given I cannot conceive, unless a deed poll or grant is shown, which all the courts hold to be unnecessary.

An uninterrupted user of land for 20 years, under claim of right as between individuals, the law presumes to be evidence of a *grant*; and as between the owner of the fee and the public, a like uninterrupted use for that or even a less period, the law presumes and holds the evidence of a *dedication*.    Then what is the claim of right on the part of the public? for the courts cannot be intended to hold the absurdity that every man who uses the land, or who rides over an open highway, should declare that he does it claiming a right in the public.    It is held in the opinion of the supreme court in the present case, as an admitted principle of law, that a street, highway or public passage may be derived from a dedication, to be shown by the express assent of the owner, or inferred from an adverse user of 20 years.    We have seen that a user of 20 years is not requisite to establish a dedication to the public use of a street or highway, and that six or eight years, under the circumstances of the case, is sufficient for that purpose ; and I shall, I think, conclusively show that the same principles which apply to the dedication of streets and highways, apply with equal force to all other dedications of property or easements to the public.    We all know that in the acquisition of the public right to a street or highway thus thrown open or left open by the owner, there is no actual claim of right on the part of the public, but each man passes over it without troubling himself about who is the owner of the fee. Nine out of ten know nothing about him, or about the circumstances under which they obtained the right of travelling the same without being trespassers.    It is therefore of necessity brought down to the *mere user*, which is in fact the sole and only evidence which can be offered on the part of the public, in order to establish their right in the

street, highway, public square, or public landing, in connection with the fact that the same had been open to the use of the public with the knowledge of the owner of the fee, and without any dissent having been expressed on his part.

After these general remarks, I shall proceed to the examination of the principles as settled by the adjudged cases on this branch of the inquiry—what is the evidence of a dedication?

In *Shaw* v. *Crawford,* 10 *Johns. R.* 237, it was held by the supreme court of this state, that a stream, although the fee of it belonged to the owners of the adjoining banks, and was private property, having been used by the public for the purpose of rafting down boards and timber for a length of time, had become a public highway, and any obstruction of it was a nuisance. And the court held that such a *usage would of itself grow into a public right,* and especially where the public interest or public convenience are essentially promoted; and in support of this principle the court cite the cases of 1 *Camp.* 260, 463, and 6 *East,* 208. The act of throwing open the property to the public use without any other formality, is sufficient to establish the fact of dedication to the public. ˙3 *Verm. R.* 526. This was the case of the public square or college green at Burlington. The counsel for the defendant in error insisted upon the argument here, that the dedication of land for streets and highways depends upon different principles from that of the dedication of other property; the acts being in the case of streets or highways open and known to the public; and the supreme court, in their opinion in the cause, seem to favor that position. I can find no authority for such position, and I believe such a distinction does not exist in the adjudged cases. In the case of the *Rugby Charity,* 11 *East,* 375, the same principle was applied in England to the dedication of a street, as had been applied in Vermont to the college green or public square, viz: that the fact of the dedication was to be presumed from the user.

It is further urged by the counsel, that there must be *an unequivocal act* on the part of the owner to warrant a dedication, and that such act is manifested in throwing open a street,

highway or public square, and the inference is sought to be drawn that therefore the principle is not applicable to this landing. I grant that such is the law in relation to dedications; but I cannot see how that act is more manifest in the case of a street, highway or public square, than it is by doing precisely the same act in the case of the landing—as in this case by throwing it out to the public use and by marking the bounds between it and other property by a permanent fence, and permitting that user for a great number of years, under the eye and immediate inspection of the owner. We suppose we see some distinction from the fact that most of us never before heard of a public landing, and can now scarcely realize what it is—and not having been in the habit of thinking of it in connection with that principle, we fancy, and it is fancy merely, that the same proof applied to it is an entirely different thing than when applied to streets, highways or public squares, about which we have before heard. So much are we the creatures of habit.

The supreme court of the United States in the case of the *City of Cincinnati* v. *White's lessees,* 6 *Peters,* 435, expressly hold that the doctrine of the law applicable to the dedication of highways must apply with equal force and in all its parts to all dedications of land to public uses. And that it was so applied by that court to the reservation of a spring of water for the public use, in the case of *McConnell* v. *The Trustees of Lexington,* 12 *Wheat.* 582. In the same case the court, after examining the case of *Jarvis* v. *Dean,* 3 *Bing.* 447, say in respect to those dedications: All that is required is the assent of the owner of the land, and the fact of its being used for the public purposes intended by the appropriation; that this was the doctrine in the case of *Jarvis* v. *Dean,* with respect to a street, and the same rule must apply to all public dedications; and that from the *mere use* of the land as public land thus appropriated, the *assent* of the owner may be presumed. Although I contend, in accordance with the principles of the foregoing decisions, that long continued user is evidence of such right in the public by dedication, yet I admit it is evidence merely; and that the circumstances of the user are

to be considered, and the more especially whether the *intention of the owner* to dedicate to a general public use is found. 6 *Verm. R.* 364. 7 *Barn. & Cress.* 243. But still it is not in the absence of all proof on the part of the owner, to be presumed that the public, where they have for many years used the land for the same purposes for which they now claim to use it, and have done so with the knowledge, and in fact under the eye of the owner and without any let or hindrance from him, had so enjoyed such use under a mere *license* from the owner; nor is it to be presumed under such a state of facts that they have in it any thing short of a full and perfect easement. Where the owner throws open a piece of land and does not mark by any visible distinction that he means to preserve all his rights over it nor exclude persons from using it by positive prohibition, he shall be presumed to have dedicated it to the public; and from the very nature of the case, the affirmative lies upon him, to establish the fact of a mere license, or that it was used against his assent—for his assent will be presumed until the contrary is shewn. 1 *Camp.* 262. 6 *Peter's,* 435. And thus we find that in the first case reported in *Strange,* decided in 1735, and in the last important cases decided by the supreme court of the United States, the same doctrine is substantially held, that user is the evidence of the dedication; and no evil has arisen from its application for more than a century.

This brings me to the consideration of the last branch of this general enquiry, to what subjects have this doctrine of dedication been applied? This part of the subject becomes the more necessary from the fact that the supreme court, in their opinion on this matter, appear to have entertained the idea that the principle of dedication has been limited, in the words of the opinion, to "lands for charitable and religious purposes, public ways and squares, commons and parks, and other easements in the nature of ways." In a common sense view of the case it would seem that a public landing was more in the nature of a way than a park, or a court house square. But to the examination of the proposition. The supreme court of the United States, in deciding the

case of the *City of Cincinnati* v. *White's lessees,* 6 *Peters,* 435, hold the following doctrine : " It is admitted that dedications of land for charitable and religious purposes and for public highways are valid ; and the principle, if well founded in the law, must have a general application to all appropriations and dedications for public use; and that the doctrine of law as applicable to highways must apply with equal force and in all its parts to all dedications of land for public uses.". Plots of land have been set apart for the interment of the dead, and have been used for that purpose with the assent of the owner ; and they have been hallowed by the use. The right of the owner to reclaim them has been denied. 6 *Verm. R.* 364. 2 *Peters,* 566. This principle is equally applicable to a dedication of lands in a city or village to be used as an open *square* or a *public walk.* 4 *Paige,* 513. And in *Sullivan's* history of land titles, under the class of public immunities—the subjects of dedication, the author has enumerated *burying places, training grounds,* and *common landing places.* In England the doctrine has been applied, in addition to highways and roads, to the right of *towing* over private property upon the banks of a river. 3 *T. R.* 253. And to a *public quay* in the city of London, for the landing of goods, and which the court likens to a way. 8 *id.* 608. So a right to a *watering place* in the inhabitants of Southwark is sustained in *Co. Litt.* 56, *a.* In our own country : in the state of *Maine,* its applicability to *public landings* is recognized, 1 *Greenl.* 111, and also to *church lands. Id.* 271. In the state of *Massachusetts* it has also been applied to a *public landing.* 8 *Pick.* 504. In the state of *Connecticut* it has been applied to land used for the purposes of *fishing.* 5 *Conn. R.* 311. In the state of *Vermont* it is applied to the *public square* in the village of St. Albans, 2 *Verm. R.* 480 ; to the court house square at Burlington, 3 *id.* 521 ; to the college green or square in Burlington, 3 *id.* 530 ; and to the court house square in Windsor, 6 *id.* 355. In the state of *New-York* the supreme court have applied the same principle to a *stream of water* acknowledged to be private property. 10 *Johns. R.* 237. By the court of chancery it has been applied to the *public square* at Watertown, 4 *Paige* 513, and also to land set

apart to *pious uses.* 3 *id.* 296. In *Pennsylvania* the same principle has been applied to a bequest to a church to furnish bread for the poor. 17 *Serg. & Rawle,* 88. And in the supreme court of the United States that principle has been extended to a public spring of water at Lexington, 12 *Wheat.* 582; to a burying ground; 2 *Peters,* 566; to the public common or wharf in the city of Cincinnati, 6 *id.* 435; to glebe land, 9 *Cranch,* 292; and to property for charitable purposes for the benefit of sailors, 3 *Peters,* 99. And thus it would seem that there is little or nothing the use of which can be of any value to the public, but has become by legal decisions, either in England or in some of the states of this confederacy, the subject matter of dedication; and that to an extent that it is now almost impossible to discover any such right or interest to which that principle has not been or cannot be applied, in its fair and legitimate use and application.

After stating pretty much all the cases cited on this argument, and after adverting to the doctrine as laid down in Hammond's Nisi Prius, from which a long and important extract is made, and after mentioning the case of *Bull* v. *Herbert,* 3 *T. R.* 253, which holds that although the banks of rivers and of the sea are private property, yet the public might by general usage acquire the right of towing over the same, the supreme court in their opinion in this case say that they still want a case of *customary exclusive occupation by the public.* I must confess, although I have given this matter much thought, I do not understand how there can be a case of customary exclusive occupation in the public. If I understand this case—there is no such right set up here—the public claim the right of landing for the purposes that they have used it for more than twenty years past; the presumption therefore is, that the dedication was for that purpose—and surely the courts will not interfere and prevent parties making such bargains as they see fit provided there be nothing immoral or illegal in their contracts. The public urge this claim for the same purpose and length of time, which if set up by an individual instead of the public, the courts would have been obliged in

law to have presumed a grant from the owner in favor of such-right. The right here claimed is to land and deposit goods, manure, &c. until they can conveniently be taken away. It is no answer to this or any other legal claim thus set up, that it may be *abused*—that the property may be kept there to the injury of others, and thus prevent them from enjoying their rights in the easement. The reply is at hand—it has been used in the manner now claimed for more than twenty years past—and the inhabitants of the island who are more particularly interested in the preservation of this public immunity, have never complained that their rights have been infringed. It is extravagant and not warranted by any of the facts of the case as before us, to suppose that it is intended to deposit and keep manure there perpetually. The claimants are farmers, and the manure would be worth much more upon their farms than it would be to leave it upon this landing. This objection should have no weight, for the further reason that this easement is subject to the control of the public officers in the part of the country in which it is situated, who are bound to see that it is so used as may be most conducive to the public interest and advantage.

Having thus shown what a dedication is—what is the evidence to support it—and the numerous instances in which the doctrine has been applied to other subjects than those in the nature of ways—the question recurs, can the subject here claimed be dedicated to the public as an easement? which is the only remaining question to be considered; for if it can, I have already shown that the evidence adduced was sufficient to establish it.

In the application of these legal principles to the subject matter of this controversy, one of the most serious difficulties with the supreme court appears to have been to ascertain what the terms " public landings and watering places," in the act for regulating highways upon Long Island, meant; to what it refers; and how it is understood in practice in the counties upon that island ; as is expressly stated in the case of the *The Commissioners of Highways of North Hempstead* v. *The Judges of Queens county,*

17 *Wend.* 11 ; where it is said, " there may be some difficulty
in fixing by judicial construction, in the absence of all evi-
dence on the subject, an appropriate meaning. That it is a
power, which, no doubt, was originally conferred to remedy
some particular grievances in respect to the use of these
places, the full and free enjoyment of which must be a
great public convenience, on account of local causes existing
on that island." The supreme court were entirely right
in this view of the matter ; and the difficulty of understand-
ing the meaning of the term *public landings,* and conse-
quently of appreciating the great public convenience which
would result from the full and free enjoyment of the same,
have undoubtedly been among the reasons which prevented
that court from seeing the strong applicability of the princi-
ple of dedication to them ; and also from being satisfied
with the force and extent of the proof offered to sus-
tain that right in the public. It appears to me that the
court in the case above referred to, insensibly approach-
ed towards that rule; for they hold that the right to
use this piece of ground, being the same landing in ques-
tion here, must stand upon the principles of the common
law, by which they must have intended that the right of
the public to it must depend upon the solution of the ques-
tion whether the landing has been dedicated to the public
use by the owner. That *such landings* have existed upon
Long Island from the earliest period, is a matter of public
notoriety in the several counties on that island ; and the
strong probability is, that they were first laid out pursuant
to public authority. We find their existence recognized in
the " Act for the better clearing, regulating and further lay-
ing out public highways in Kings county, Queens county,
Richmond county, and Orange county," passed November
29, 1745 ; the seventh section of which act speaks of high-
ways from any town or plantation to any " *common landing
places*," as places then well known. They were also recog-
nized at a still earlier period, in the " Act for the better
clearing, regulating and further laying out of public highways
in the county of Suffolk," passed October, 14, 1732 : the
sixth section of which act speaks of highways leading from

towns or plantatations to *watering* or *common landing*
*places.* These public or common landing places, undoubt-
edly were laid out in each of the counties upon that island
both upon the sound and upon the bays leading in from the
ocean ; for without them the inhabitants whose lands did not
border upon the water, and they composed and do still, a
very large amount of the population of those counties, could
have no means of getting off the island with their produce,
or of returning to it with their merchandize and other neces-
sary articles without committing thousands of trespasses in the
course of a year. It is not a reasonable or legitimate course
of argument, which supposes that a community would for al-
most two centuries, continue in a state of sufferance liable to
be the subjects of vindictive prosecutions every time they
should differ with their neighbors who owned the land upon
the water side ; and especially so, if the supreme court are
right in the position which they lay down as the law in their
opinion, in this case, that " the landing of waggons, horses
and passengers, on the shores of a river, a sea or an ocean,
even though it be upon a dedicated or recorded highway, on
the land connected with the watery way, and for the
direct purpose of going forward, is still a trespass on the
riparian owner, unless we could suppose such acts to be
performed without any contact between the vessel and the
shore." Allowing this to be the law and that the public
could not acquire any absolute right to such landing, I am
persuaded " it would open a field of litigation which no com-
munity would endure ;" and what would be still worse in a
moral point of view, it would convert the hitherto peaceful
agricultural community into a band of hostile litigants, break
up the social relations of families, and effectually destroy all
that good will and brotherly affection which they have
hitherto felt and manifested toward each other, and uproot
the harmony and peace which have existed between them
for ages. I have no question in my mind that those land-
ings, thus laid out, were originally made matters of record ;
for we find, by the report of the case of *Cortelyou* v. *Van*
*Brundt, 2 Johns. R.* 357, that on the trial of that cause at
the circuit, there was given in evidence a memorandum of

Post v. Pearsall.

the record of a *public landing* at the Narrows in Kings county, upon that island, in an *ancient book,* which was produced by the clerk of that county, and proved by him to be the only existing record of the roads in that county, which was made part of the defence in that cause, but failed from want of proof of the location and user of the landing.   Another fact may be drawn by inference from this ancient record, which is, that the inhabitants of that island, from the earliest period, identified their public landings with their highways, both in their regulation, controlling, and, in Kings county, recording the same together in one book.

To a person who is in the least conversant with the history, state and situation of that island during the seven years of the revolutionary war, it will not be a matter of surprise that no record has been produced to establish the authoritative laying out of the landing in the present case; on the contrary, it is rather a matter of surprise that a single ancient record now exists, either of a highway or landing upon that island.   Many of the towns in those counties lost part, and some the whole of their public records, during that period of war, disorganization and plunder.   The town, now the city of Brooklyn, was among the latter, and after the close of that contest, there was scarcely a scrap in the shape of a record to be found which had belonged to that place. Indeed, so entire was the loss, that on the 9th of February, 1798, an act was passed by the legislature of this state allowing such copies and abstracts of the records of Kings county as relate to the town of Brooklyn, to be regarded as the records of that town.   This fact would seem to make it the more necessary that the courts should rather look with a favorable eye upon the doctrine of dedication, when invoked in aid of a district thus circumstanced, and in the preservation of rights of which they have been for very many years possessed, without any dissent shown on the part of the owner of the fee, than to refuse the application of the doctrine to a case most clearly within both the spirit and letter of the rule.

The towns upon Long Island have been from the time of their first settlement, and most of them are now, the

owners of considerable portions of land known as common or public lands, which were formerly vested in trustees, and are now, by virtue of an act of the legislature, vested in the towns themselves. Some of these lands so owned by the towns come down to the water's edge, and on such parcels, it may have been, as is urged by the counsel for the defendant in error, that such landings have been laid out and called public landings; and I apprehend, if such was the fact, and the public at large had used such landings for the period for which this landing is proved to have been used, that it would not be in the power of that town, by selling the land on which the landing was situated in connection with the surrounding and contiguous lands as a farm to an individual, to divest the public of the right which they had thus acquired in it. Those rights belong to others beside the inhabitants of that town, and the circumstances would amount to a dedication to the public use, which could not be resumed after such an enjoyment; and the purchaser would take his farm subject to that easement in the public.

But there is still further evidence of the existence of such easements to be found in the "Act to regulate highways in the counties of Suffolk, Queens and Kings," passed April 2, 1813, which authorizes the commissioners of highways in the several towns to regulate highways, *public landings* and *watering places* already laid out, to lay out others, and, if need be, from time to time, to take a view of the same; and if they find, upon view, any such public landings or watering places lessened, obstructed, or blocked up, to open the same. The provisions of this act are full to prevent the obstruction of those landings; thus expressly recognizing twenty-six years ago the existence of such public landings, as having been already previously laid out—which means either a statutory or an authoritative laying out. As to the former, taking the evidence of the continued user on the part of the public for more than twenty years, as shown upon the trial, in connection with the circumstance of the loss of public records in the towns upon the island, or even without that additional circumstance, it is evidence of such a statutory

laying out, if such evidence can in any such case as the present be required, for even without such statutory laying out, it is good as a dedication. But before the revolution, and at the very early period when these landings were most probably originally established, there could be an authorita- tive laying out without a statutory provision to that effect; it might have been done by virtue of an order of the gover- nor and council, or it might also have been done under an order of the courts of general sessions, which courts, about a century since, exercised a supervisory power over all public highways and other public easements and rights, and made orders for their regulation ; and if they had been laid out un- der any such order, I apprehend it would be a legal act, and one upon which the statute of 1813 could have ope- rated.

The next act of the legislature on this subject was the "Act regulating highways and bridges in the counties of Suffolk, Queens and Kings," passed February 23, 1830; and the second subdivision of the first section of this act enumerated, among the powers of the commissioners of highways, that of regulating "the roads, *public landings*, and *watering places* already laid out ; and to alter such of them as they or a majority of them shall deem inconvenient." This act was prepared by a convention held by the three counties upon Long Island for that especial purpose, in the autumn preceding its passage. The gentlemen who formed that convention, inhabitants, and most if not all of them free- holders in those counties, must be presumed to have known what they were about, and what they designed by the act thus framed by them. They undoubtedly believed that there were already a sufficient number of these public land- ings and watering places which had been legally laid out, or which had become the property of the public by dedica- tion, to meet all the wants of the community. And they had good and sufficient reason to believe so, after having found the legislature both of the colony and state of New York, gravely legislating upon that matter in no less than four separate and distinct instances during the period of a

century ; and they would not have been justified in indulging for a moment the idea that after such events it could be in the power of any court or jury to question the legal existence and proper laying out of those landings. They intended that no new ones should be laid out; but they unquestionably believed they had given sufficient power and authority to the commissioners of highways to preserve and regulate those already in existence. The power and authority thus given can apply only to the landings in the situation of the present, and to those laid out in the manner before designated ; for it is admitted that there is no act of the legislature now in existence which expressly authorizes the laying out of such landings, but the act 1813. Unless this view of the case is adopted, it must be considered either that there is no meaning to be applied to the words *public landings* and *watering places,* as here used, and they must be rejected, (which this court have not the power to do ;) or those terms must be applied to such landings laid out in the manner before mentioned, or to those laid out in fact, or dedicated by the owner ; or that the power to lay out public landings already in use, is embraced in the general power to lay out public highways. In the true construction of this act, it appears to me of but little moment that the power to lay out those landings already in existence is not specifically given by the act of 1830, for the legislature did not intend by that omission, to curtail or discharge any public right which had been acquired to those landings by dedication. It is only necessary to apply to this question the just and equitable rule laid down by the supreme court in the case of *Shaw* v. *Crawford,* 10 *Johns. R.* 237, and the whole difficulty vanishes. The court there held, that " although the Battenkill be admitted in the statute declaring certain rivers and streams public highways, this omission cannot prejudice or impair the right which the public may have acquired by usage. The object of the act was not *to release* any public right, but to ascertain and declare it in cases where it otherwise might have been doubtful, or liable to dispute and interruption."

Having shown that public landings, *eo nomine*, are expressly recognized as the subject of a dedication to the public, and the case having been clearly brought within the rules of evidence, as laid down by the adjudged cases, for the purpose of ascertaing the fact of a dedication, the result is inevitable that the subject here claimed can be dedicated to the public as an easement; and that it is no more of an interest or *profit a pendre in alieno solo*, than is the easement which the public acquired in the public square at Watertown, or in the court house square at Windsor, or in any other of the numerous instances of easements which I have heretofore adduced.

The supreme court find no difficulty in sustaining the principle of dedication as applicable to *streets* and *highways*, and have been satisfied that a dedication as to them had been made by the owner to the public from no other circumstance than the continuéd user by the community at large. And this they have done undoubtedly because it is for the benefit and advantage of the public that it should be so; and also because the owner of the fee derives a compensation for the easement which he has thus parted with to the public, from the consequent increased value of his remaining lands in the vicinity. In the case of *Bolt* v. *Stennett*, 8 *T. R.* 606, a *quay* in the city of London, for the landing of goods, was held to be dedicated to the public, but the supreme court seem to think that case not applicable as an illustration of the present subject, because the public enjoyed the right upon making a compensation to the owner. Is not that the case in all dedications? The compensation, as is well established by our law, need not in every instance be a pecuniary one; there may be other good and valuable considerations operating upon an individual to induce him to dedicate such an easement to the public—such as the increased value which his surrounding and adjoining property derives from it, which is a case of very common occurrence. Let us see whether this view of the case is not applicable to the subject under consideration. Pearsall's ancestor is the owner of the farm upon which the landing is situated,

and is also the owner of the greater part of the lands in its immediate vicinity. Before the dedication of this landing, there was nothing to attract the public in that direction. The *locus in quo*, as urged by the counsel upon this argument, is the only convenient spot in that neighborhood for a dock, and consequently for a landing. Is it' not, therefore, reasonable to suppose, that in order to induce the public to come and trade at that spot, his ancestor should have dedicated that landing to the public? And can any one pretend to say that both Mr. Pearsall and his ancestor was not greatly benefitted by the existence of that landing, in the increased value of the adjoining lands, and in being enabled to erect a store-house and other buildings there, and in bringing to them the business and trade of the surrounding country? The map annexed to the case, which exibits the location of this landing, with the store-house and other buildings in its vicinity, together with the circumstances which appear throughout the case and on the argument, show that Mr. Pearsall has received a full and ample compensation for the easement which had been granted by his ancestor to the public. In another point of view, I cannot see how the supreme court could entertain the idea, that the fact of compensation makes any difference between the case of the present landing and that of the public quay in London. The public statutes of this state, in several instances, from the year 1732 to the year 1830, recognize the legal existence of such landings; and as the proof given by the plaintiff in error shewed that this had been used as such landing for more than twenty years, and in fact, from time immemorial, the inference is irresistible that it had been either laid out by the public authorites in a legal manner, or had been dedicated in an equally legal manner to the public use by the ancestor of Pearsall; and that the owner had been paid a due and proper compensation for the easement which the public had thus obtained. I suppose there is no legal objection to paying the whole of the compensation in the first instance; and that there can be no real difference between that mode of paying, and the

giving so much money for every bale of goods landed upon the quay or public landing.

The objections urged to the dedication of this landing also rest upon the case of *Cortelyou* v. *Van Brundt*, *2 Johns. R.* 357, which I have before adverted to, and some other cases which I shall hereafter notice. But as the case of *Cortelyou* v. *Van Brundt* is much relied upon as a ruling and controlling decision in this matter, both by the counsel for the defendant in error and also by the supreme court, I shall here give it a more critical examination than was before deemed necessary. It was an action of trespass *quare clausum fregit*, for entering the close and erecting a hut. The defendant's plea was not guilty, with notice that he would offer in evidence that the freeholders and inhabitant of New Utrecht, and also the citizens of this state, from time immemorial, used the right of fishing in the bay adjoining the close in question, and occupied the shore or beach adjoining that bay, and that it being the proper time for fishing, he had entered and erected a temporary hut on the close in question. The erection of the hut was the only trespass proved; and the supreme court by Justice Thompson, (the same judge who decided the celebrated dedication case of the *City of Cincinnati* v. *White's lessees*, in the supreme court of the United States, and which I have previously noticed,) decided that the facts did not amount to a justification of the trespass in erecting the hut; that a right to fish in any water gives no power over the land. Nor will *prescription* in any case give a right to erect a building on another's land. The controlling part of this decision, and indeed of the case, is to be found in the latter part of the opinion of the court, and is as follows: " The defendant must derive the right he sets up, either from the patent itself, or from usage ; " [ the patent gave no authority to fish beyond its bounds, which did not extend to the *locus in quo :* ] " and if from the usage, *it must be specially pleaded*, or stated as a gruond of defence in the notice. The defence in both these respects totally failed, as the patent contained no color for the right, and the usage to erect huts was not one of the matters of defence *expressed in the notice* which had been given."

The other casas cited by the counsel for the defendant in error are cases where either the presumption of a full and perfect dedication was *rebutted* by some continued act of the owner, as putting a bar or gate across the street, 1 *Camp.* 263, *note;* or where the dedication was shown by the evidence to be a partial one, 7 *Barn. & Cress.* 243 ; or where the claimants had been in the habit or usage of fishing, by drawing in a seine by hand, and afterwards, without the consent of the owner, erected a reel or capstan upon his land, 5 *Conn. R.* 311 ; or where the claim was for a *profit a prendre in alieno solo,* for which the party must prescribe in a *que estate.* 4 T. R. 718. These would be analogous cases, if the defendant in error had kept up a fence or gate across this landing from the first, and shut out the public, and not permitted them to come upon it without his permission ; or had shewn that this was a partial dedication, which would probably have been impossible, as all the proof goes to shew that the user, which is evidence of the decication, was general ; or had shewn that this was a case of prescription by individuals in a *que estate ;* but none of these being the fact, those cases are of little or no value in settling this question, and have no legitimate bearing upon the same. The only other case cited was that of *The Commissioners of Highways of the town of North Hempstead* v. *The Judges of Queen's County,* 17 *Wendell,* 11, which I have before adverted to; and which has but a slight bearing upon the present subject.

After admitting the extensive application of the principle of dedication, the supreme court, in their opinion in this matter, insensibly fall into the doctrine, that " the rights inferrible from usage, both the servitude of the civil and the easement of the common law, rest almost without exception an the idea of a grant between competent parties : citing 3 *Kent's Comm.* 434, 444, 3d ed., and that the only easement by dedication to the public, mentioned by the learned commentator, is the common highway or street." The learned judge who delivered the opinion, says that he has " searched in vain among the English books for the idea of a grant which can enure to the personal use of all man-

Post v. Pearsall.

kind." In this I have not the least doubt he is entirely cor-
rect, and fully believe that he would never find such a grant
if he should pass a whole life in search of it, for the reason
that in the case of easements for the benefit of the public,
it is not usual to give grants, because there is no grantee
to take, and therefore a grant, as such, is not presumed ; I
believe the courts have invariably held that the easement is
not the less perfect and valid, because it wants both a grant
and grantee. In this case, no such grant is set up or hinted
at ; the claim sought to be established here is not a *grant*
to the personal use of all mankind, but a *dedication* for the
use of the citizens and inhabitants of the state of New
York—in which ease the law does not require there should
be a grantee capable of taking. The court again in a sub-
sequent part of the same opinion reiterate the idea of a
*grant*, and observe, in this case " there is no one to take,
and none to release, and that the claim is novel, and, by an
English authority binding upon us, has been expressly de-
nied, and that too in a series of instances, including *Gate-
ward's case*, 6 *Rep.* 60 ;" and then proceeds to examine the
latter case, which, with all due deference to the learned
judge, has nothing to do with the matter under considera-
tion. All that was decided in that case was, that a person
prescribing for a right of common for pasturage, i. e. *a right
a prendre in alieno solo*, must do so in respect to some es-
tate, and not, as was done in that case, rely upon a mere
inhabitancy. This is not a case of prescription, founded
upon that part of the English law which grew up under the
state of lords and vassals, which formerly existed in that
kingdom. The freemen of the state of New York are not
here prescribing for a right in this landing in a *que estate,* or
by *mere inhacitancy* under a feudal lord. That very case
recognizes as an exemption from its rule the only right
which the then half civilized state of the public in that king-
dom found sufficient for their accommodation, and the court
there expressly hold that that easement in the public, the
only one their wants then required, was not a charge or
*profit a prendre* in the soil of another, but a mere easement.
It is undoubtedly true, that the English law has allowed the

extension of customary and prescriptive rights to *individuals*, and uniformily denied them to the *public*, because those rights never did apply except to individuals or corporations, and the public could not prescribe in a *que estate*, nor plead a *custom*—for, as the courts have held, when it applies to the public at large, it is the common law, and the courts are bound to take notice of it, and it is not required to be pleaded. But as the wants of the community have extended with their increasing trade and civilization, the courts have also extended the doctrine of dedication; and I say, and the cases will bear me out in so asserting, they have applied it to every case where the public had been in the uninterrupted use of the land for a requisite period of time, and where it was necessary for their accommodation that their right should be so sustained. The case cited by the court, in *2 H. Black.* 393, proves this position; as does also *Fitzgibbon,* 51.

The supreme court seem to regard it as of great moment in this decision, that we have *Gateward's case,* which is obligatory upon our courts, and which lays down the law in relation to *customs by prescription.* I regard it of equal importance that we have the case in *Strange,* 1004, which is no less binding upon our courts than the former; and which establishes the law of *dedication.* As to the relative value and importance of those two cases in settling this controversy, I think there can really be but little difference of opinion. The *first* gives us the law as applicable to the local rights of individuals or the community of a town or village, which from a part of their inheritance, and relates to a branch of the law which it is admitted was never adopted in this country; the *second* proves to us the legal existence of the doctrine of dedication at an early period; a principle which applies only to the rights of the public and cannot relate to those of individuals; and which was brought to this country with the rest of the common law by our forefathers, and has been extended and defined in numerous instances, as the wants of the public extended in connection with the rapid growth of the country in population and wealth. The *first* never could under any circumstan-

ces have become applicable to the state of society, and the equal diffusion of property among our people ; whilst without the *second*, the steady growth of the country would have been seriously retarded.

From the foregoing examination, I am entirely satisfied, that there can be such a dedication made as that sought here to be established ; and that the evidence adduced and offered to be given, is sufficient to establish and prove it ; and therefore, in my opinion, the judgment of the supreme court should be reversed.

By Senator LIVINGSTON.  I do not conceive it necessary, neither do I feel competent to examine and expound the numerous authorities on the subject of *dedications*, which were cited and commented upon by the counsel, in the argument of this cause, as the views which I have taken of this case, do not render it important to decide what constitutes a *dedication* of right to the public.

The claim set up by the defendant is, that the public at large have a right to deposite all articles of whatever nature they choose, without limitation as to the quantity or as to the time of the continuance of such deposite. It was not claimed on the trial of the cause, or upon the argument before this court, that the public had any right, except such as they had acquired by user of the premises.  It was admitted that the public might acquire a right to a highway or street, and to a public square by dedication ; but it was denied by the counsel for the defendant in error, that there could be a public right to occupy the ground of the owner of the soil in fee, as a place of deposite of property.

The only benefit which the owner can derive from his title to the soil, is the right to occupy it himself.  No authority was read on the argument which established the principle that the soil belonging to one man, could be occupied by another, unless by a licence, or permission of the owner.  All the cases cited, admitted the right of property to be in the owner, and merely established the principle, that another person might have an *easement* in the soil ; but no case was referred to in which such easement ex-

tended to an actual occupation of the soil. A right of way does not include a right to occupy; a highway is merely a place for passage and re-passage, and a public square is also in a limited sense, a place for passage and re-passage. Indeed public squares in all the cases cited, were either called or treated as highways, and no case was read in which it was decided, that the public had a right of deposite in a public square. In the cases of dedication referred to from the Vermont reports, public squares are treated as highways and were so called by the courts, and in the Watertown case, the chancellor considered the public square as a highway, and called it a public square or public walk. So in the Cincinnati case the court considered the square as a highway merely. If then as the right claimed by the plaintiff in error is a right to deposite, and not merely to pass and repass or load and unload, the law relative to *highways*, does not apply in this case; for it was admitted that the public had no right of deposite in a highway, but only a right to pass over it.

Even if the right claimed by the defendant was claimed as an individual right, it would not be an *easement*, for as I remarked before, every easement is a right issuing out of the soil, and not the right to *possess* the soil, it admits the posssesion to be in the owner of the fee. But how could it be said that the possession of the soil was in the owner of the fee, when another person had covered the soil with his property. If I take a lease of a farm from another, I have the right of possession as long as my lease continues, and the manner in which I would exercise my right of possession would be by cultivating the soil, by ploughing and gathering the crops, or by depositing my property upon it. This is all the possession I could have, and a deposite of my property upon the soil, would be a more complete and exclusive possession, than the mere tilling the soil. A right of way either public or private does not take away the title to the soil, nor does it give it any other person but the owner of the soil a right to the possession. But even if an individual could have a right to occupy the soil of another, by depositing his property upon it, it does not follow that the public

can have such a right, for a place of deposite is in this respect very different from a highway; all persons may use a highway without interfering with each others's rights, and the great convenience, and indeed absolute necessity of highways, requires that all persons should have a right to use them. But how can it be possible that all persons can use a place of deposite. If it is open to all persons, the first occupant has a right to occupy the whole of it, and no one has a right to turn him out. Of course, it cannot be said that any other person has a right to deposite upon it; for from the necessity of the case case, no other person can take possession, while the first occupant is in the rightful possession; and it is absurd to say that one person has a right which he cannot exercise, because the right of another, prevents him from exercising it. The case of *Cortelyou* v. *Van Brundt*, seems to decide this question. It was there held, that a man could not acquire a right by user to erect a temporary hut on the soil of another; and if so, he certainly cannot take possession by placing any other property upon it, or by making a deposite which may be temporary, or not, as suits his convenience.

In short, it seems that the premises on which the deposite was made, the use of which is claimed by the public, was a part of the farm of the defendant in error, lying contiguous to the sea shore. That at the time when the population in the neighborhood was small, and the necessity for the public use of course limited, the owner of the soil permitted the public to make deposites upon the premises. This appears to have been a mere licence, not intended to vest any right in the public, but to be temporary and for the accommodation of the neighborhood, revocable, however, at any time when it might suit the convenience of the owner of the soil. There is no doubt in my mind, that the proprietor of the soil would still have continued to accommodate his neighbors and the public with the privilege his ancestors granted, had not that public abused the favor, by depositing large and offensive heaps of filth and fermenting manure, filled with contagion and death, directly in front of his lawn and dwelling, thereby rendering his domicil un-

healthy, and disagreeable.   Similar licenses to use land, adjoining public navigable waters, where it is not particularly wanted at the time for agricultural purposes, are not uncommon.   But these licenses are evidently merely temporary, and are not intended to divest the rights of the owner of the soil, or to give any to the public; and such is undoubtedly the general custom and understanding.   On the whole, I am of opinion that the claim set up by the plaintiff in error is contrary to sound reason and common sense, and is not sustained by the authorities cited by his counsel on the argument of this case: and that, therefore, the judgment of the supreme court ought to be affirmed.

By Senator VERPLANCK.   The definition, character and legal effect of a dedication of lands to public purposes seem well enough settled in our law.   The only doubts are: 1. To what sort of rights does this principle extend? and 2. By what evidence may such dedication be shown, or from what may it be inferred?

A dedication of land to the public purposes, in the sense of our decisions, I take to be the deliberate appropriation of land by its owner for any general and public uses, reserving to himself no other rights in the soil than such as are perfectly compatible with the full exercise and enjoyment of the public uses to which he has devoted his property. Such an appropriation our courts have held will take effect without any formal deed, or any matter of record, and without any specific grantee to take the title.   The land, by the deliberate act of dedication, becomes subjected to the objects and purposes of the dedication, and is held for the benefit of all who may choose to enjoy them. In respect to such an opening of land for streets and highways, the law has been clearly settled by numerous decisions here and in England, both as to the effect of the dedication itself as to its external evidence.

Now I see no reason upon principle, why such an appropriation should be confined to roads and streets.   The very same reasons of public spirit or private interest that induce the proprietor of the soil to abandon his right of way to the

world at large, may equally lead him to set apart to the community a square for public recreation and health, a parade ground, a mineral spring, a landing place, a burying yard, or a place of temporary deposite for any of the purposes of commerce or agriculture. The landed proprietor's inducement for such a dedication may be precisely the same as in the case of a highway. It may be munificence and public spirit. It may be the desire to add beauty, health, or convenience to a favorite neighborhood, or it may be merely the intention to improve his own property, while he benefits his neighbors. In any other dedication, as well as of a road, the proprietor deliberately sets apart his property to certain uses, and invites the world at large to enjoy the privileges he offers. In either case, he invites individuals to build, improve and make other arrangements of life and business in reference to such public rights. The convenience and comforts of society require that the policy of the law should equally protect all these and similar public interests as much as the right of way. Were it, therefore, now an entirely new question, I should hold that the doctrine of public dedication must extend to every use or easement of land which can be of any service or convenience, or pleasure to the community at large. This view is confirmed and established by the adjudications of various courts in our own country, successively extending and applying the doctrine of dedication to different objects as they happened to be presented.

Within a few years, the courts of this state, (our own court included,) have decided that when the owner of city property has laid it out into lots with intersecting streets and avenues, and has sold with reference to such a plan, he has so far dedicated the streets and avenues to the public, that he cannot deprive his grantees of the benefit they may derive by having such ways laid open; nor claim compensation for the soil which he has thus dedicated to public uses. 2 *Wendell*, 472. 8 *id*. 80. 11 *id*. 486. The chancellor applied the same rule in the case of the trustees of Watertown to a village public square. 4 *Paige*, 513. So the supreme court of the United States supported the ap-

propriation of a spring of water at Lexington to the public use. 12 *Wheat. R.* 580. And again, in the still more elaborately considered case at Cincinnati, where the equitable owners before perfecting their title had laid out the town plat, designating a portion for a *common*, for certain useful purposes of business, and lands were sold and houses built with reference to the arrangement ; this the court considered a sufficient and valid dedication. 6 *Peters' R.* 437. Similar decisions have been made in the courts of other states, particularly in *Vermont*, on very elaborate argument and well considered opinion. 2 *Verm. R.* 480. 3 *id.* 521. 6 *id.* 355. I cannot, therefore, assent to the doubts expressed by Judge *Cowen*, as to extending the doctrine of dedication beyond highways. I think we are authorized, both by the reason of the matter and the authority of numerous strongly analogous American cases, to consider the doctrine as applicable to a *landing place* on the banks of a river, or the shores of the ocean, and its bays and inlets and all the uses of deposite or otherwise to which a landing place may be put.

If there has been a deliberate act by the owner of the soil, setting apart a portion of the shore for a public landing or for a place of deposite, which dedication has been accepted and confirmed, either by frequent public use or by individuals building, making roads, or other arrangements of business with reference to such a landing, I should consider it as set apart to the public use ; the original owner reserving to himself no rights whatever but such as are compatible with the full and general enjoyment of the easement. Such a dedication, with respect to highways, may be made either by express designation in maps, deeds, or other evidences and muniments of property, or else by other clear, unequivocal and decisive acts of the owner, amounting to such a positive manifestation as cannot be mistaken, to make a permanent abandonment of his property to certain specific public uses. *See cases above cited, and 3 Kent's Comm.* 451.

The next point of inquiry then is, what is the sort and degree of evidence admitted or required by the law in order to establish such a public right to the qualified use and en-

joyment of private property ? Can such a right be supported without positive and direct proof that the land had been deliberately appropriated to the purposes in question by the owner himself? Or, on the other hand, will evidence of frequent and continued use for twenty years by the public with claim of right to such use, be sufficient to establish a prescriptive right in the people at large, as it would, in similar circumstances of a private claim, establish an individual right to an easement or servitude in the lands of another.

The general principle of prescription is, that where there is an undisputed enjoyment of any easement of way, water, drains, party wall, or any incorporeal right affecting the lands of another, without interruption for twenty years, such exclusive and adverse enjoyment raises a prescription of title to the easement against the owner of the soil who has not asserted his opposing rights. Some few of the authorities even give to the presumption the effect of conclusive evidence of title ; but all agree that at least such possession, when adverse and unrebutted, imposes on court and jury the necessity of presuming a grant. This last is the more general doctrine of the books and authorities of our own country. Now the principle of prescription is founded in common sense and the observation of human nature ; for it is nothing more than a legal and somewhat technical application of the rules of presumptive evidence : a species of reasoning which regulates the conclusions and conduct of all men in the daily affairs of life. The presumption of a fact is the conclusion drawn in the silence of all positive proof, from such existing circumstances as common experience shews ordinarily to accompany or follow the fact presumed. One of the greatest of modern civilians has condensed the whole philosophy of presumptive evidence into a definition of six words: " *Presumptio, ex eo quod plerumque fit.*" *Cujas* as quoted by *Pothier.* Every well grounded presumption, then, is but an inference of the understanding from the common observation of life and the usual motives and conduct of mankind. It bears the same character in the law, being there, nothing more than the same inference

of the understanding thrown into the form of a legal rule and sanctioned by former judicial decision. Thus ; where no interest has been paid on a bond, and no demand proved thereon for twenty years, it would be a natural inference of the understanding, that it was highly probable according to the common course of human dealings, that the debt had in some way been discharged or settled or voluntarily given up. Accordingly, courts will recommend it to the jury to presume that it was discharged. What was the conclusion of probability in particular cases, at first, has now been made by decision a legal rule.

How the doctrine of prescription grows out of the presumption of reason, cannot be better explained or expressed than it has been by Lord Chancellor Erskine, in a beautiful and philosophical opinion, worthy of the earlier and most brilliant days of that eloquent and original man. " The presumption," says he, " from length of time, stands upon clear principle ; it is built upon reason, the nature and character of man, and the result of human experience. It resolves itself into this : that a man will naturally use what belongs to him. That is the whole principle. It has been said that you cannot presume unless you believe. It is because there are no means of creating belief, or disbelief, that such general presumptions are raised upon subjects, on which there are no written muniments or records. Therefore upon the weakness and infirmity of all human tribunals judging of matters of antiquity, instead of belief which must be the foundation as to a recent transaction, when the circumstances are incapable of forming any thing like belief the legal presumption holds the place of particular and individual belief." And again : " Mankind, from the infirmity and necessity of their situation, must, for the preservation of their rights of property, have recourse to some general principles to take the place of individual and specific belief, which can hold only as to matters within our own time, and on which no conclusion can be formed from particular and individual knowledge." *Hilary* v. *Watkins,* 12 *Ves.* 265.

It is on such grounds, from the necessity of some general rules of property, from public policy requiring that long

user or possession should not be disturbed, and from the or-
dinary probability that in most cases where one man has
for many years used another's property with claim of right
to do so, that such claim was morally rightful at least, if not
legally so, the doctrine of prescription as to private rights
was originally established in England, and has been gene-
rally received in the American courts.   But in receiving
the rule and the authorities explaining and supporting it, we
ought to go beyond the letter of the law, and to look back
at the reasons on which it rests, limiting or regulating or
rejecting it, as the particular circumstances of our times
and country differ from those of England.   This our Amer-
can courts have not hesitated to do in several instances, as in
varying the terms of prescription in different states.   It has
accordingly been held, that the presumption of grant in fa-
vor of *ancient lights,* does not apply to buildings on the lots
of our rapidly increasing cities and villages.   *Parker* v.
*Foote,* 19 *Wendell,* 309 ; and other cases of similar import
will be found in the reports of different states.   The same
sort of natural presumption of a private right does not al-
ways arise here, as matter of inference, from the same cir-
cumstances in our state of society that they produce in an-
other.   The legal presumption forming a prescriptive right
ought to be accordingly sometimes modified, and American
courts have done so, where it was notorious that a proprie-
tor would ordinarily, in this country, permit his neighbor to
have a certain use of his land for light or air for years, with-
out the remotest idea of relinquishing any single right him-
self.

Then, how stands the doctrine of public prescriptive
rights ?   The doctrine of prescription is applied, with full
force, both in England and here, to *public roads* and *city
streets.*   Here, this English rule of prescriptive right to pub-
lic roads seems to me to have been wisely adopted, because
its presumption is in unison with the experience of our
country, and in conformity, therefore, with the sound rea-
soning of presumptive or inferential evidence.   The publici-
ty of a road or street, its notoriety of use, the total incom-
patibility of any other use or occupation of the surface with

such a continued transit—the various interests of parties which grow up with reference to it, and depend more or less upon its preservation—the benefit or convenience resulting commonly to the proprietor himself; all these circumstances furnish such strong presumptive proof of a voluntary relinquishment of all right of soil incompatible with the public transit, that, without any legal rule or judicial authority, they would be decisive with a jury in nineteen cases out of twenty as to the owner's intention. We have accordingly adopted the decided law as we found it, converting the ordinary inference of reason and observation into a positive legal presumption, establishing a right by legal prescription. This presumption is, moreover, confirmed by the great convenience of the rule, as well in actual litigation as in the adjustment of numerous rights of property dependent upon public thoroughfares—all of which would be uncertain, if proof of actual dedication was left to be made out by parol evidence, after an enjoyment of twenty years.

Can we on this authority, and for the same reasons, extend this rule to the analogous case of dedication of other rights or easements in land to public use ?

The first objection which will occur to such an extension is the absence of nearly all adjudged authority for so doing. Among the many English cases in the law of prescription, collected by the industry of counsel or of the learned judge who pronounced the judgment of the supreme court, I find none that carries the public prescriptive right beyond streets and highways. Indeed, the inference to be drawn from some of them, (as that of 2 *H. Black.* 393, and especially Judge Buller's opinion,) is directly hostile to any such doctrine. Again: in the numerous American cases, I find none applying the rule of prescriptive evidence to any dedicated use other than of thoroughfares, excepting one single case, that of the decision of the supreme court of Massachusetts in 8 *Pick.* 304; the high authority of which, and the ability and learning of Judge Wilde's opinion, I cheerfully acknowledge. That decision is, however, in contradiction to a prior one of the same court, 4 *Pick.* 145; and

it otherwise stands alone.   In the other cases where dedications to public uses other than that of streets and roads have been upheld, I find that *evidence of user* was not received for the purpose of establishing a prescriptive right or legal presumption of prior dedication, but merely in *connection with other evidence to prove actual dedication,* and the acceptance, occupation or use under it by those meant to be benefitted.   Long user is not relied upon as sufficient presumptive legal evidence of dedication, but is adduced in the same manner as if it had been a claim resting upon a lost deed, where use and occupation might serve to corroborate other probable evidence of the existence of such an instrument, and shew the acceptance and the extent of the right accruing under it.   Thus, in the case of the *Lexington Spring,* Chief Justice *Marshall,* after stating the evidence, thus recapitulates : " The reasonableness of reserving such a spring for public uses, the concurrent opinion of all the settlers that it was reserved, the universal admission of all that it was never understood that the spring lot was drawn by any individual, the early appropriation of it to public uses, the length of time permitted to elapse without any assertion of title, the fact that the claimant drew another lot, &c., are decisive."   12 *Wheaton,* 583.   Again : in the Cincinnati case : " The fact of the dedication to public use," says Judge Thompson, " is not left to conjecture, from the circumstances that the land was enjoyed for years as a common ; but the *actual dedication is established* by the most probable and certain evidence."   6 *Peters,* 438.   So in the Vermont cases, 11 *Verm. R.* 480, 6 *id.* 355, there was *evidence,* parol or documentory, *that the land had been set apart,* and the evidence of user went to support this, and to shew public acceptance.

Is there, then, in the silence of authority, any thing in the reason of the matter to raise such a presumption of dedication upon evidence of long user in a case like the one before us.

The ordinary state of society among us, and our manner and habits as influenced by our extensive territory and thinly scattered population ; our equality of condition ; the extent of vacant land even in the vicinity of large towns ;

the distance or absence of many proprietors ; the small comparative value of much land for present purposes, which the owner often rates highly for its future and contingent purposes ; the frequency of permitted uses of land such as in other countries would be jealously guarded from intrusion ; the familiarity with which permission is presumed, and leave taken as a matter of course, and this without complaint or offence, all combine to exclude such a presumption. If an owner of the shore permits it to be occupied every year by a *temporary deposite* of timber, in rafts, as we often see along our rivers ; if a vacant field near a village is used for years as a *parade ground* for the militia, or a *play ground* for school boys, who amongst us would infer from those facts that the proprietor had actually and designedly relinquished his property to the public for those uses ? Who could consider proof of such use for twenty years, even connected with a vague notion of right in those who thus used it, sufficient evidence of an actual abandonment of the land to the public, whilst the owner still continued to exercise over it all the other evidences and rights of property ?

This is not what commonly happens here. It is not that " *quod plerumque fit*," according to the civil law definition. Every day's experience here, shows the contrary. Such permitted use of shores or vacant grounds, is allowed for years without the slightest idea of an actual surrender of any rights of property. Actual and formal *grants* of land to public uses are common enough with us. But the mere circumstances of use by other persons occur a thousand times without any such surrender. It ought not, therefore, to be presumed from them, with us, as if they were its usual and certain accompanying indications.

It is then, not only from the absence of legal authority, but moreover and especially from the absolute improbability of any such presumption in this and similar cases, that I must reject the idea that a *prescriptive right* in the inhabitants of the state can be acquired merely by common user of land for other purposes than those of roads and streets. Nor can I perceive the same necessity or good policy in allowing mere prescriptive public rights in such cases that

there is for applying the doctrine to highways. The balance of public utility, in my judgment, inclines the other way. Landing places, watering places, open grounds in towns and villages, are all of that nature, that the proprietor may permit others to use them to a great extent without lessening his own use or enjoyment. It is neither just or politic to make such liberal permissions, hazardous to the rights of property. I fully agree with Judge *Cowen*, that "considering our extensive lines of coast, lakes and rivers, the long public enjoyment of landings on mere courtesy, and under the notion of mere license, revokable when the resort should become inconvenient ; considering like circumstances in respect to other objects—watering places at the shore, and in creeks, springs and wells, a rule of law which should admit the possibility of turning such enjoyment into prescriptive and absolute right on the part of the public would open a field of litigation, which no community could endure. What is still worse in a moral point of view, would be perverting neighborhood forbearance and good nature, to the destruction of important rights." In addition to these considerations, the peculiar character of our institutions and legislation afford another and most cogent argument against extending the legal rule of public prescriptive right beyond the limit which it has already reached. There is no necessity of public convenience that demands it, whilst private convenience and individual rights might often be severely injured. Nothing, as the experience of every winter's legislation shows us is more easy, than for the public to obtain by law such a right to an easement, enjoyment or general use of property, as any considerable number of citizens find useful or desirable, by means of law and of payment of an adequate compensation. This may often be obtained under existing laws, as those for city or local improvements, paid for by assessments ; or it may be done by special law passed on petition, when if the public interests demand it, the interest of the individual must yield, provided an adequate compensation be secured. In every such case, full justice may be done to the individual ; whilst the existence of the mere public prescriptive right growing out of good

natured or careless permission, would commonly work great hardship and wrong.

My whole view of the doctrine is accordingly this : All sorts of easements and rights to enjoyment of land, whether of use or of pleasure, which may be acquired by an individual by *grant* or *prescription*, may also be acquired by the public by actual dedication ; and that the public right when acquired, stands on the same ground as the right to streets and roads. But, excepting only the case of roads or streets, such dedication cannot be *presumed* as a mere legal inference from a prescriptive user, but should be *proved to have been made* by writing or by public and unequivocal declarations or acts ; that the evidence of user is good only to shew that such dedication was accepted and enjoyed, and to *corroborate* or *explain* other evidence or probabilities. This is not precisely the doctrine of the supreme court, but it covers the decision made under their direction by the judge at the second trial, " that the public could not acquire any right by user to the landing in question," to which the defendant below excepted.

On the other points of local law I adopt the construction and conclusions of the supreme court, and shall therefore vote for affirming their decision.

On the question being put, *Shall this judgment be reversed?* All the members of the court present who had heard the argument, with the exception of the PRESIDENT of the Senate, and *Senators* FURMAN, MAYNARD and WORKS, voted in the *negative*. Whereupon the judgment of the supreme court was *affirmed*.