MAYOR, &C., OF NEW-YORK *v.* STUYVESANT'S HEIRS.

PETER COOPER *v.* THE SAME.

A conditional limitation of the legal fee, and not a power, was created by these provisions in a deed, made before the Revised Statutes, of land in the city of New-York to two grantees, the owners of adjoining property, their heirs and assigns, to their own use forever, viz., that the estate should cease unless the land should, within thirty years, be opened and appropriated as a public square; the conveyance being upon the trust to permit the grantor, his heirs and assigns, to receive the rents and profits until the square should be thus opened, and after the grantees should have elected so to open and

appropriate it, then upon the further trust that it should forever be kept open as a public place.

Such deed was not a dedication of the land by the grantor as a public square, nor did it impose a duty upon the grantees to devote it to that object but conferred an authority, to be exercised or not by them, at their own discretion and for their own benefit.

This authority, even if construed as a technical power, was capable of assignment or delegation. Having been transferred, with his interest in the land, by one of the grantees to a third person, who conveyed to the other grantee, and by the latter, having thus the whole interest, to the city of New-York, the city acquired the right to open the square within the thirty years, and, having performed the condition on which the fee was limited, became seized of the entire legal estate subject to the trust.

The city, being about to open the square, was not bound to litigate the mere legal title in a proceeding instituted against it by the heirs of the original grantor, before the expiration of the thirty years, under the statute "to determine claims to real estate," but was entitled after the institution of such proceeding to bring its suit, as in equity, to determine all its rights and those of the heirs, both in their legal and equitable aspects.

No dedication of the land for a public square can be implied against the heirs of the grantor from its representation as a mere blank, undistinguished from the streets surrounding it, upon a partition map made by such heirs and by reference to which they conveyed lots, twenty years before the expiration of the period within which the election to open it was vested in the grantees of the square or their assigns, the square being then covered with buildings, and such map not professing to show a partition of all the land inherited.

APPEAL from the Superior Court of New-York city. The defendants, who are the same in both actions, are the heirs of Nicholas W. Stuyvesant. They claimed title to a triangular piece of ground lying between the Bowery, Third-avenue and Seventh-street in the city of New-York, which had been laid out and opened as a public place, called Stuyvesant-square. On the 17th of July, 1852, they instituted a proceeding, under the Revised Statute relative to the determination of claims to real estate, by causing a rule to be entered in the Supreme Court and notice to be served upon the city corporation, requiring it to assert its claim to the land in the manner required by that statute. (2 *R. S.,* 312.) Immediately thereafter the corporation instituted the first above entitled action to restrain the defendants from the further

prosecution of that proceeding, and from instituting any other proceeding to assert their claim to the land, and from interfering with or disturbing the corporation in its appropriation and improvement as a public square. Peter Cooper commenced an action for the same general purposes, which is that secondly above entitled. He set up a general interest as a corporator in the improvement of the square, and a special interest as the owner of property adjacent thereto, among other lots, that on which the Peter Cooper Institute stands, and averred a purchase by himself of such property in reliance upon an implied dedication of the square by a partition map, made and dated in May, 1834, upon a division of part of the real estate of Nicholas Stuyvesant among his heirs, on which the square was represented as open and undivided land.

The actions were brought on for trial together, before Mr. Justice EMOTT, without a jury, who found as facts: That, on August 1, 1825, Nicholas W. Stuyvesant and wife, by their deed of that date, for the consideration of one dollar, conveyed to Charles H. Hall and Robert L. Reade, all their estate in that certain triangular piece of land (describing what was afterwards called Stuyvesant-square) *habendum* " to the parties of the second part, their heirs and assigns, to their own proper use, benefit and behoof forever, in trust, nevertheless, and for the uses and purposes hereinafter expressed of and concerning the same, and to and for no other use, purposes or end whatsoever, that is to say, in trust to permit the said Nicholas William Stuyvesant, his heirs and assigns, in the meantime, and until the said hereby granted and conveyed parcel of ground shall be opened as a public square, to receive and enjoy the rents, issues and profits thereof; and after the said parties of the second part, their heirs and assigns, shall have elected to lay open and shall actually open the same as and for a public square, then upon the further trust that the same be forever thereafter kept open and appropriated to and for the sole use of a

public square or street, to be called Stuyvesant-square, and to and for no other use or purpose whatever: Provided always, that if the said piece or parcel of ground shall not, within thirty years from the date of these presents, be so opened and appropriated as and for a public square as aforesaid, then and from thenceforth these presents shall cease and determine, and the estate hereby granted shall revert to the said Nicholas William Stuyvesant, his heirs and assigns, to their own proper use forever, anything herein contained to the contrary in any wise notwithstanding." The deed further stated that the grantees (who did not execute it) covenanted jointly and severally to indemnify Stuyvesant, his heirs and assigns, against any assessment or imposition which might at any time thereafter be laid or imposed upon him or them, or his or their estate, in respect of any estate or land which he then owned, for or by reason of opening the square or that part of Seventh-street which adjoined it.

On the day of this conveyance Stuyvesant had conveyed several parcels of land in the immediate vicinity of the square to the same grantees.

On the 20th day of August, 1828, Robert L. Reade conveyed by quit-claim to James Hooker all his estate and interest in the square, under the above described deed, to be held for the same uses and purposes; and on December 1, 1828, Hooker quit-claimed to Charles H. Hall; and on December 23, 1828, Hall conveyed the premises, with full covenants, to the corporation of New-York, " as and for a public or open square or place," subject to certain leases then outstanding, of parts of the land constituting the square, which was at that time, and for several years afterwards, covered with buildings. In 1850, the corporate authorities obtained an act of the legislature for altering the city map and laying out thereon Stuyvesant-square, as a public place, and procured the appointment of commissioners of estimate and assessment, to appraise the damages sustained by the owner of a lot constituting a portion thereof, which Stuy-

vesant had sold before his conveyance to Hall and Reade in 1825. These damages were assessed upon the remainder of the land constituting the square, and were paid by the city. The final order of confirmation of these proceedings in the Supreme Court was made July 31, 1852.

Peter Cooper derived his title to lands in the neighborhood of the square under deeds executed by all the heirs of Stuyvesant, which referred to a partition map entitled " Map showing a division of part of the real estate late of Nicholas W. Stuyvesant, deceased, among all his heirs, May, 1834." Upon this map, the ground which constituted Stuyvesant square was undistinguished from the streets which surround it, and not represented by any boundaries, divisions or designation. It was shown to have many houses upon it, which, from 1825 down to the time of the trial, had been suffered to dilapidate and fall to ruin without repair or interference.

Charles H. Hall died January, 1852, and Robert L. Reade October 5, 1852.

The plaintiffs in both actions had judgment for the relief demanded by them, and these judgments were, on appeal, affirmed by the Superior Court at general term. The defendants appealed to this court.

*J. W. Gerard*, for the appellants.

*Nicholas Hill*, for the city of New-York.

*John E. Parsons*, for Peter Cooper.

JOHNSON, Ch. J. The conveyance of 1825 from Stuyvesant and wife to Hall and Read, of the property now designated as Stuyvesant-square, after acknowledging a pecuniary consideration, grants, bargains, sells, releases and conveys to Hall and Reade, and to their heirs and assigns forever, the above mentioned premises, to have and to hold, unto them, their heirs and assigns, to their own proper use

forever. These expressions, prior to the Revised Statutes, were effectual to vest the whole legal estate in the grantees, whatever might be the form of equitable interest created by the subsequent trust provisions of the deed. (1 *Sugden on Powers*, 153; 1 *Hill on Trustees*, 3d *Am. ed.*, 251.)

Passing over for the moment the disposition of the equitable interests, the deed contains a provision that the legal estate thus granted shall cease, if within thirty years from its date the premises shall not be opened and appropriated as a public square. The equitable interest in the legal estate thus created is disposed of as follows: The grantees are to hold in trust, to and for the uses and purposes following, and for no other use, end or purpose whatsoever; that is to say, in trust to permit Stuyvesant, his heirs and assigns, in the mean time, and until the premises shall be opened as a public square, to receive and enjoy the rents, issues and profits thereof, " and after the said party of the second part, their heirs and assigns, shall have elected to lay open and shall actually open the same as and for a public square, then upon the further trust, that the same be forever thereafter kept open and appropriated to and for the sole use of a public square or street, to be called Stuyvesant-square, and to and for no other use or purpose whatever." Thus, by the effect of the deed the legal fee was in Hall and Reade, but was to revert to Stuyvesant if the square was not opened in thirty years. If it was opened within that period, and from the time of the opening, the legal fee was to remain in the grantees, their heirs or assigns forever, in trust for the public use of the land as a square. Until that event happened, if it should happen within the period limited, Stuyvesant, his heirs and assigns, as *cestuis que trust*, were to enjoy the rents and profits.

It is apparent that Stuyvesant, by the terms of this deed, did not dedicate the land in question as a public square. It was to revert to him in case it was not opened, and upon its reverting he was to have it in fee to his own use, as he

had it before the deed was made.   Nor did he, by the terms
of the conveyance, impose it as a duty upon the grantees,
their heirs or assigns, that they should open it as a public
square.   The terms chosen, limiting the trust estate as to
arise only after they, their heirs or assigns, shall have
elected to lay open, and shall actually open the same, make
this manifest.   Indeed, the first expression employed seems
to have been introduced for the purpose of excluding any
possible implication of a duty to open the square.   For as
an election to open would be necessarily included in and
shown by the actual opening, those words must be taken to
have been introduced to make it clear that they owed no
duty, in respect to opening the square, either to Stuyvesant
or to the public.   They had not, therefore, a trust to open
the square, for trusts are always imperative, and are obliga-
tory upon the conscience of the party intrusted. (2 *Sugden
on Powers,* 173.)   They, on the contrary, were at liberty to
open or refrain from opening the square as they saw fit, and
in exercising this liberty they were not bound to regard any
interests but their own, and might properly be governed by
any motives or induced by any considerations which they
chose to consider sufficient to direct their action.   Had
they agreed with third persons for money, either to open or
to abstain from opening the square, there could have been
no objection on any ground to the agreement, and they
would have received the money to their own use.   In short,
this privilege, whatever was its legal character, was their
property.   The circumstances which attended the execution
of this deed strongly corroborate the view which has been
stated.   On the day of this conveyance Stuyvesant had
conveyed several parcels of land in the immediate vicinity
of this square to the same grantees.   Looking to the future
value of the lands thus purchased, it was or may have been
regarded as important to them that they should have the
privilege of opening this square.   Stuyvesant appears to
have been willing to permit it to be opened, provided he was

not put to any expense in regard to it, and the period of thirty years was fixed upon as that within which the question would naturally be determined. This is the fair interpretation of the intention of the parties, as embodied in the deed and collected from examining their respective positions. If Stuyvesant, instead of executing the deed in question, had given them an agreement that at any time within thirty years, on application and payment by them, their heirs or assigns, of the expenses, he would lay open the square, there would have been no more difficulty in enforcing a specific performance of that agreement than there is in enforcing an ordinary agreement for the sale of land. One of the two could have transferred his interest to the other, and he to a third person, and a court of equity, at his suit, would have decreed specific performance.

This right or privilege was not a power in its legal sense. They were to appoint nothing ; were to execute no instrument; but the provision of the deed was, that if they did a certain act, *in pais*, an estate was thereupon to arise in trust for the public use. It was a conditional limitation ; and the question arising upon it is, whether the event which the parties had in contemplation has happened. If A., having three lots of land, and conceiving that the value of two of them would be greatly increased by having a house on the third, even though it belonged to some one else, should, to effect the building of that house without expense to himself, give a lease to B. for three years, with a provision that if during the term he should build a house, his estate for years should thereupon become a fee ; if he built within the time he would have acquired the fee, not as having executed a power, but as having performed the thing or brought about the event on which the fee was limited. The substantial nature of the limitation in the deed in question is like that in the case supposed. It is, therefore, not subject to the rules which govern the execution of powers.

Nor if it were, and this limitation were regarded as a power, does it follow that there could be no delegation of the authority. There is no general and inflexible rule against such a delegation. The inflexible rule is, that a confidence reposed cannot be delegated. (*Sugden on Powers,* 249.) Wherever there is a discretionary trust of course there is a confidence, even though it be a trust resting in a discretion, the exercise of which can neither be compelled, if the trustee will not exercise it, nor controlled, if he exercise it unwisely. In such cases it is apparent that the discretion has been created for the benefit of some one other than him who is to exercise it, and that the creator of it looks to have it exercised upon grounds of propriety, depending, perhaps, upon circumstances which cannot be noticed in a legal or equitable forum, but which address themselves wholly to the conscience, good faith and wisdom of the person to whom the discretion is committed. But where an authority exists without this element of confidence, and is to be exercised for the mere benefit of the party holding it, the reason fails. And in such cases, at least, if the assignment by its terms permits a delegation, the law does not forbid it. (*Cole* v. *Wade,* 16 *Ves.,* 44; 1 *Sugden on Powers,* 223, *and cases cited.*)

As, therefore, Hall and Reade did not, if this instrument created a power, take it as trustees, but in their own right and for their own benefit, the terms of the limitation "to them, their heirs or assigns," whether it be a power, or a conditional limitation, as I regard it, should be construed as they would be construed if they were contained in an agreement, by Stuyvesant, to open the square, on their request and payment of expenses. In such a case there can be no doubt that one could transfer to the other, and that he then would have the whole interest and might transfer it. Such was, in substance, the effect of the instruments in proof in this case. By them the city of New-York acquired the right which Hall and Reade had

to open the square, and they rightfully proceeded within the thirty years to exercise that right.

It remains to consider whether they were entitled to adopt the form of proceeding to which, in this case, they have resorted. If the legal estate was not in the corporation, no objection is perceived to the form of their suit; for, in that case, as both the right of the Stuyvesant heirs to the rents and profits, until the thirty years should have expired, and the right of the corporation to put an end to their enjoyment of the rents by actually opening the square, were each carved out of the equitable interest, and were not dependent on the legal estate, and an equitable forum was peculiarly appropriate to deal with the rights of the parties. In that condition of the legal estate, no determination, upon the mere legal title, could have effectually, during the thirty years, settled the rights of these parties. And as the corporation was about to proceed to a large expenditure of public money in a matter of public interest, and where it rightfully represented the public interest (*Watertown* v. *Cowen*, 4 *Paige*, 510), and the Stuyvesant heirs were in possession, claiming that the right to open the square was at an end, a resort to the equitable powers of the court seems to have been requisite to a complete and satisfactory disposition of the controversy.

If, on the other hand, the legal title was in the corporation, a recovery by it upon that mere title, during the thirty years, and before the actual opening of the square, would not have touched the question really in controversy between the parties. It would have left undecided the question whether the city could rightfully open the square, and its effect would have been to turn the Stuyvesant heirs over to the necessity of themselves instituting an equitable suit to restrain the city from proceeding to open the square, which, by virtue of its mere legal estate, it could have proceeded to do, without judicial proceedings of any sort. Even in a suit by the city, upon the mere legal title, the

Stuyvesant heirs might probably have introduced into the controversy, under the present system of procedure, the whole equitable controversy between the parties, and, therefore, there seems to be no valid objection to the city submitting, in one suit, all their rights, both in their legal and equitable aspects, to the judgment of a single tribunal. The only objection made, either in the answer or on the trial, to the form of the suit was, that the notice given by the Stuyvesant heirs rendered it necessary for the city. to bring an action, on the mere legal title, in the Supreme Court. Even if the Code, section four hundred and forty-nine, has not, as I incline to think it has, taken away the right to proceed to compel a determination of claims to real estate in any other way than by a regular action under the Code, still, the provisions of the Revised Statutes were framed to deal with mere legal controversies and could not have afforded any adequate remedy in respect to the equitable elements of the present controversy. The city was, therefore, not bound to submit to this partial and incomplete litigation, but properly brought the whole controversy, in all its aspects, in a single suit, before the court for adjudication.

The case of Mr. Cooper stands upon a very different ground. His individual right rests upon an implied dedication by the Stuyvesant heirs by means of the partition map of 1834. That map does not represent these premises at all, but leaves a blank where they are situated, the space which on the map would appropriately belong to them being continuous with that which represents the Bowery. The fact that, for more than twenty years after that map was made, those premises were subject, by virtue of the deed of 1825, to be thrown open as a public square by those over whom the Stuyvesant heirs had no control, seems to afford a sufficient and satisfactory solution of the omission to represent them upon the map. The heirs could not desire to partition premises so situated ; no

reasonable men would have done so. Property, subject to such a right for so long a period, could not be compared in value with other property absolutely owned. The allotment of it to any one of the parties to the partition would have given him what might be either of great value or of very little, as the square, should or should not happen to be opened. Under such circumstances the parties to the map cannot be deemed to have intended to dedicate this land to public use. Nor, as the land was then covered with buildings, can any one purchasing lots in the neighborhood be regarded as buying on the faith that such a dedication had been made or agreed upon. The least inquiry would inevitably have led to the knowledge of the existing facts in regard to the condition of the property. Indeed, the plaintiff's own allegation founds his supposed right on a reliance upon the deeds, as well as upon the map, at the time of his purchase; and as a reference to those deeds would have disclosed the facts as they appear above, he cannot be regarded as having been misled by the acts of the Stuyvesant heirs, nor as having thereby acquired any equitable right of estoppel as against them. His suit should, therefore, have been dismissed.

ROOSEVELT, J., delivered an opinion for affirming the judgment in favor of the city of New-York; all the judges concurring,

Judgment for Mayor, &c., of New-York affirmed. Judgment for Peter Cooper reversed, and his complaint dismissed.