Johnson, Ch. J.
As early as 1823, a project was on foot in Waterville to build a new church, and, in connection therewith, to make a public green or common. In 1824, a church corporation was formed, lands were conveyed to it, and in that and the succeeding year a church was built, and the triangular piece of land in front of it, bounded on the sides by two highways, was cleared of buildings and graded. To this labor, as well as to the building of the church, persons other than those connected with that church contributed. After the triangle was thus cleared off and leveled, it remained for about twenty-five years open and uinnclosed. During all this time, every part of this open space was used for the accommodation and convenience of the church societies, and also as a common passageway for foot-passengers and teams passing from one road to the other, and as a place for military parades, and ball-playing and other amusements, for storing lumber while a jfiank road was being built along one of the highways adjoining it, and for many other public and private purposes. These, in the main, are the uses to which we should expect to find a village green subjected, except the storing of lumber, which can hardly be supposed a rightful use, but one temporary in its nature, and acquiesced in from a general desire to facilitate the making of the plank road. In addition to these facts, a subscription paper, for purchasing a church site and building a church, was proved, made in 1823, to which Aaron Hackley signed his name for $50, “ to be paid in land at the rate of $100 per acre, for the site of the house.” To this was added: “It is understood that my subscription is not binding, unless as much of John McLeish’s land, opposite my house, is thrown out to be in common for a public green.”
*259 This is followed by an agreement, dated April 7, 1824, by John McLeish with John Williams and others, by which McLeish agrees, on or before the 1st of June then next, to convey to the trustees of the First Presbyterian Society three-fourths of an acre of land; they to pay him $125, payable according to the terms of the subscription paper for the meeting-house, and to remove the buildings and fences and place them on another lot.
Hackley having died in 1823, his heirs, on the 24th April, 1824, conveyed to the trustees, in fee, a piece of land forming the base of the triangle, and bounded towards the apex of the triangle by McLeish’s land, which formed the residue of the triangle. The deed contained a condition that the grantees should, in a reasonable time, erect a meeting-house on the premises, or on the adjoining premises lately occupied by McLeish, and that the granted premises should be used for no ■ other purpose than a site for such meeting-house, and as forming a part of the public common appertaining thereto; and that the said premises, and those adjoining, shall not be otherwise encumbered or built upon, or used as a cemetery or burial-place, by the grantees, but may be fenced. The premises to revert, on failure of the condition. The grantees were also to fence the southwestern or base line of the triangle, and tó keep it in repair.
This was followed on the 10th of June, 1824, by a conveyance from McLeish and wife, of the residue of the triangle to the trustees, which contains a declaration that a small piece of land at the apex of the triangle, four rods and one link on one road and eight rods and four links on the other, was forever to remain a common.
This again was followed, on the 16th of June, by a deed from the Hackley heirs to the trustees, of a piece of land, of forty and three-fourths rods in contents, lying at the centre of the base and outside the triangle. As to this land, there was a condition in the deed that the grantees should, in a reasonable time, erect a meeting-house on it, and that it should not be *260 used as a cemetery or burying-place; the premises to revert on failure to perform the condition.
Looking at these conveyances, in connection with what was actually done, it seems clear that there was an intention originating, so far as appears, with Hackley, carried on by his heirs after his death and concurred in by the trustees, of securing, in addition to the meeting-house, a public green or common. The project seems to have steadily grown and been persisted in from its proposal by Hackley in his conditional subscription—when it related only to the half acre of McLeish’s land opposite Hackley’s house—through its second stage, when the church was to be on the triangle, and the residue to be a public common—as manifested in the first deed of the Hackley heirs—up to its final form in which it actually took effect, by placing the meeting-house on the lot at the base of the triangle, in pursuance of the last conveyance of the Hackley heirs. To that departure from the terms of the condition in their first deed, the Hackley heirs consented by their second deed, which provides expressly for the erection of the meetinghouse on its actual site. We find, then, the Hackley heirs stipulating, substantially, as the condition of their conveyance, that their lot should form a part of the public common, of which the terms of the deed, as well as the other circumstances, lead irresistibly to the conclusion that the McLeish lot was to form the residue; and that neither part of the premises should be otherwise built upon or encumbered (not .with liens but, as is apparent from the connection, with structures) than by the meeting-house which it was afterwards agreed should be placed on the subsequently acquired lot. This leaves the whole triangle to remain unbuilt upon as a part ,of the public common “appertaining” to the meeting-house. This word is plainly used in the sense of physical connection merely, for any other sense is inconsistent with the idea of a ..public common. A mere ornamental churchyard, belonging in all senses to the church, could not properly be so designated. Nor do the terms of the conveyance or the attendant ..circumstances admit of that interpretation.
*261 These views’do not involve the determination of the question, whether a church corporation can dedicate to public uses its own property, because it must, upon the facts found in this case, be held that the ultimate form which the transaction took was in contemplation, in substance, from the beginning, and that the various conveyances were made for the purpose of bringing about that end.
The condition of the Hackley conveyance is something more than a mere private stipulation'for their own advantage. • It plainly indicates a purpose to have the common dedicated to the public, and when that purpose was actually carried into effect by practical dedication and devotion of the premises to the proposed public use, it was no longer in their power to release the condition. That no such actual application of the premises to the public use had taken place was the difficulty in the way of the plaintiff in Cooper v. Stuyvesant (17 N. Y., 34).
The dedication in this case comes within the principles of the judgment in Post v. Pearsall (22 Wend., 425), as explained in the leading opinion of Senator Verplanck. It does not stand on mere user, but the origin of the user is shown and the dedication rests upon written evidence of the intention of the parties corroborated and explained by the user. When • such a dedication is made “individuals are invited to build", improve and make other arrangements of life and business in reference to such public rights,” (S. C., 22 Wend., 473), and the rights thus resulting to individuals may be enforced by them. The plaintiff in this case, who sues as well on his own behalf as of all others having a similar interest, being himself an owner of a house and lot facing upon the public green, will manifestly suffer from the perversion of the green to any other uses, and there being no corporation of the village who might assert the general right of the public, individuals must necessarily be allowed to assert it or there would occur a failure of justice.
Dexio, J., did not sit in the case; all the other judges concurring,
Judgment affirmed.